662 So.2d 894 (1995)
Joyce PINTO, et al.
v.
ALABAMA COALITION FOR EQUITY, et al.
Joyce PINTO, et al.
v.
ALABAMA COALITION FOR EQUITY, et al.
Robin SWIFT
v.
ALABAMA COALITION FOR EQUITY, et al.
Robin SWIFT
v.
ALABAMA COALITION FOR EQUITY, et al.
Walter ANDERTON, et al.
v.
ALABAMA COALITION FOR EQUITY, et al.
Walter ANDERTON, et al.
v.
ALABAMA COALITION FOR EQUITY, et al.
1931030, 1931031, 1931141, 1931142, 1931149 and 1931150.
Supreme Court of Alabama.
May 19, 1995.
Thomas F. Parker IV and Samuel Adams, Montgomery, John Eidsmoe, Pike Road, for Pinto appellants.
Ted Pearson, Birmingham, for Anderton, Hall and Trucks appellants.
Richard N. Meadows, Denise B. Azar and Ashley H. Hamlett, Montgomery, for Alabama State Board of Education and State Superintendent of Education.
Thomas L. Stewart and Mary H. Thompson of Gorham, Stewart, Kendrick, Bryant & Battle, P.C., Birmingham, for Governor Jim Folsom, Jr.
PER CURIAM.
Joyce Pinto, Robin Swift, and Walter Anderton appeal as class-action representatives from a judgment of the Montgomery County Circuit Court denying their motions to intervene in these actions. We reverse and remand as to Pinto and Anderton, and we dismiss the appeals by Swift.
*895 The factual background of this case was broadly described in Opinion of the Justices No. 338, 624 So.2d 107 (Ala.1993). For the convenience of the reader, the factual statement is reproduced here (quoting the trial court's order as it was quoted in Opinion of the Justices No. 338):
"Plaintiffs in this action challenge[d] the constitutionality of Alabama's system of public elementary and secondary education, which they contend[ed did] not offer equitable and adequate educational opportunities to the schoolchildren of the state, including children with disabilities. They [sought] declaratory and injunctive relief from the constitutional and statutory violations alleged. Defendants den[ied] that the public school system [was] unlawful and [alleged] further that [the Montgomery County Circuit Court was not] the proper forum for resolution of this dispute.
". . . .
"These consolidated lawsuits were brought on behalf of schoolchildren, parents, and school systems throughout the state of Alabama. Plaintiff Alabama Coalition for Equity, Inc. (ACE), an Alabama non-profit corporation comprised of 25 school systems1 and a number of individual parents and schoolchildren, filed [a] complaint on May 3, 1990.... Plaintiffs Mary Harper, et al. (Harper plaintiffs), a group of public schoolchildren, filed [a] complaint on January 19, 1991.... By order dated March 18, 1991, the [circuit court] consolidated these cases. Subsequently, on April 21, 1992, the [circuit court] certified a statewide class in the Harper action of all children who are presently enrolled or will be enrolled in public schools in Alabama that provide less than a minimally adequate education.
"John Doe, a disabled student, [and the Alabama Disabilities Advocacy Program] moved to intervene ... in the ACE lawsuit on August 3, 1990, and the [circuit court] granted this motion on January 9, 1991. On July 24, 1992, the [circuit court] certified a plaintiff sub-class of all schoolchildren in Alabama aged three through 21 years with identified disabilities [`A.D.A.P. Class'].
"Plaintiffs in these consolidated actions named as defendants Governor Guy Hunt, State Director of Finance Robin Swift, Lieutenant Governor James Folsom, Speaker of the House of Representatives James Clark, State Superintendent of Education Wayne Teague, and the members of the Alabama State Board of Education [`SBOE']. However, the speaker of the Alabama House of Representatives, the Lieutenant Governor, the State Superintendent of Education and all members of the State Board of Education moved in May and June, 1990, to realign as plaintiffs, indicating that they agreed with plaintiffs' claims. The [circuit court] granted these motions.
"The Mountain Brook, Vestavia Hills, Hoover, Madison, and Huntsville school systems filed petitions to intervene in this action. On January 9, 1991, the [circuit court] denied their motions to intervene, but granted them permission to submit amicus briefs, and to resubmit their petitions to intervene at a later date. The Alabama Association of School Boards and the Mobile and Decatur school systems were granted permission to appear as [amici] curiae. Shortly before trial, the Mountain Brook, Hoover, Homewood and Shelby County school systems filed a motion to appear as [amici] curiae on behalf of plaintiffs. A+, an organization dedicated to reforming and improving public education, filed an application for permission to file a brief supporting [the] plaintiffs as [an] amicus. The [circuit court] granted these motions.
". . . .
"The [circuit court] ... bifurcated the non-jury trial of this case into liability and remedy phases. Trial in the liability phase began on August 3, 1992 and concluded on August 27, 1992....
1 The plaintiff school systems [were]: Barbour, Butler, Clarke, Coosa, Crenshaw, Geneva, Hale, Lawrence, Lowndes, Macon, Pickens, Pike, Winston, Greene, Bullock, Conecuh, Henry, Limestone, Perry, Walker, Wilcox, Chambers, Talladega, and Dallas County Boards of Education and the Troy City Board of Education."
624 So.2d at 110-12 (footnote 1 in original; other footnotes omitted).
*896 On March 31, 1993, the court entered in the "liability phase" a judgment, which included the following findings and declarations (as quoted in Opinion of the Justices No. 338):
"1. That, pursuant to Ala. Const. art. I, §§ 1, 6, 13 and 22 [guaranteeing Alabama citizens equal protection of the laws] and art. XIV, § 256 [guaranteeing Alabama citizens access to a `liberal system of public schools'], Alabama school-age children, including children with disabilities, have and enjoy a constitutional right to attend school in a liberal system of public schools, established, organized and maintained by the state, which shall provide all such schoolchildren with substantially equitable and adequate educational opportunities;
"2. That the essential principles and features of the `liberal system of public schools' required by the Alabama Constitution include the following:
"(a) It is the responsibility of the state to establish, organize, and maintain the system of public schools;
"(b) the system of public schools shall extend throughout the state;
"(c) the public schools must be free and open to all schoolchildren on equal terms;
"(d) equitable and adequate educational opportunities shall be provided to all schoolchildren regardless of the wealth of the communities in which the schoolchildren reside: and
"(e) adequate educational opportunities shall consist of, at a minimum, an education that provides students with opportunity to attain the following:
"(i) sufficient oral and written communication skills to function in Alabama, and at the national and international levels, in the coming years;
"(ii) sufficient mathematic and scientific skills to function in Alabama, and at the national and international levels, in the coming years;
"(iii) sufficient knowledge of economic, social, and political systems generally, and of the history, politics, and social structure of Alabama and the United States, specifically, to enable the student to make informed choices;
"(iv) sufficient understanding of governmental processes and of basic civic institutions to enable the student to understand and contribute to the issues that affect his or her community, state, and nation;
"(v) sufficient self-knowledge and knowledge of principles of health and mental hygiene to enable the student to monitor and contribute to his or her own physical and mental well-being;
"(vi) sufficient understanding of the arts to enable each student to appreciate his or her cultural heritage and the cultural heritages of others;
"(vii) sufficient training, or preparation for advanced training, in academic or vocational skills, and sufficient guidance, to enable each child to choose and pursue life work intelligently;
"(viii) sufficient levels of academic or vocational skills to enable public school students to compete favorably with their counterparts in Alabama, in surrounding states, across the nation, and throughout the world, in academics or in the job market; and
"(ix) sufficient support and guidance so that every student feels a sense of self-worth and ability to achieve, and so that every student is encouraged to live up to his or her full human potential.
"3. That, pursuant to Ala.Code §§ 16-39-3 and 16-39A-2, Alabama schoolchildren with disabilities aged 3-21 have the right to appropriate instruction and special services;
"4. That the present system of public schools in Alabama violates the aforestated constitutional and statutory rights of plaintiffs;
"5. That the state officers charged by law with responsibility for the Alabama public school system, are hereby enjoined to establish, organize and maintain a system of public schools, that provides equitable and adequate educational opportunities to all school-age children, including children *897 with disabilities, throughout the state in accordance with the constitutional mandates of Ala. Const. art. XIV, § 256; art. I, §§ 1, 6, 13 and 22; and to provide appropriate instruction and special services to children with disabilities aged three through twenty-one pursuant to Ala.Code §§ 16-39-3 and 16-39A-2....
624 So.2d at 165-66 (footnotes omitted).
On April 22, 1993, Governor Hunt was convicted of a felony; he was that day, by operation of law, removed from office, pursuant to Ala.Code 1975, § 36-9-2, and replaced by Lieutenant Governor Jim Folsom, Jr., pursuant to Ala. Const.1901, § 127. On May 28, 1993, the following parties moved to be realigned as defendants in their official capacities: (1) the speaker of the House of Representatives, James Clark; (2) the State superintendent of education, Wayne Teague; and (3) Alabama State Board of Education members John Tyson, Jr., Steadman Shealy, Jr., Dan Cleckler, Ethel Hall, Willie Paul, Betty Fine Collins, Victor Poole, and Tazewell Shepard. On June 8, 1993, Governor Folsom moved to be substituted formally as an official-capacity defendant in the place of former Governor Hunt.
On June 9, 1993, these parties jointly moved the trial court to certify the liability-phase order as a final judgment, pursuant to Ala.R.Civ.P. 54(b). On that day, the trial court made that order final; it also granted the motions for substitution, realignment, and certification. Additionally, the court ordered the defendants to develop, in cooperation with the plaintiffs and with Dr. J. Wayne Flynt, a court-appointed "facilitator," a "single comprehensive Remedy Plan for the purpose of ensuring full and complete compliance with" the liability-phase judgment. No appeal was taken from that judgment.
On July 14, 1993, the plaintiffs moved the court to substitute as a party defendant the presiding officer of the Senate, Senator Ryan deGraffenried, who, pursuant to Ala. Const. 1901, § 51 and amend. 57, had assumed the duties that had been formerly performed by Lieutenant Governor Folsom. The motion was granted, without contest, on July 19, 1993.
On October 1, 1993, defendants Folsom, deGraffenried, Clark, and James White, Sr.,[1] submitted a proposed "Remedy Plan" for the court's consideration. On October 22, 1993, the court issued an order incorporating the Remedy Plan with "preliminar[y] approv[al] subject to notice to the class and subclass, and a class-action fairness hearing for the purpose of determining its fairness, reasonableness, and adequacy." The court further ordered that a "Notice Of Proposed Order Settling Class Action be published at least three times in the following newspapers": (1) Mobile Press Register, (2) Dothan Eagle, (3) Tuscaloosa News, (4) Huntsville Times, (5) Opelika-Auburn News, (6) Florence Times Daily, (7) Daily Mountain Eagle, (8) Montgomery Advertiser, (9) Birmingham Post-Herald, (10) Birmingham News, (11) Gadsden Times, and (12) Anniston Star. The court also ordered that "a copy of the notice and proposed remedy order be sent to all school superintendents and school principals in the state, for posting in [the] school system and school administrative offices." The court further scheduled for November 18, 1993, a "fairness hearing," during which it proposed to entertain "arguments from class counsel and from the parties who ... submitted the proposed remedy order relating to the fairness, reasonableness, and adequacy of the proposed remedy order."
Two days before the scheduled "fairness hearing," Walter Anderton and others purporting to represent "taxpayers and citizens" of Alabama ("Anderton"), filed a "Motion for Leave to Intervene" in the action. Also, by a letter addressed to the trial judge and by appearance of counsel at the fairness hearing, Joyce Pinto and others ("Pinto") notified the court "of [their] intent to intervene on behalf of a class of parents and public school students who," they alleged, had "not been represented." Pinto's filings were supplemented on December 8, 1993, with a "Complaint in Intervention." Meanwhile, on December 3, 1993, the court had issued an order *898 in which it formally approved a modified form of the Remedy Plan.
At a hearing convened on January 25, 1994, arguments were presented by Pinto, Anderton, and former finance director Robin Swift, who also sought to intervene in the action. From judgments denying intervention, Pinto, Anderton, and Swift appealed. Pinto's appeals are identified by case numbers 1931030 and 1931031; Anderton's appeals are identified by case numbers 1931149 and 1931150; and Swift's appeals are identified by case numbers 1931141 and 1931142.
While this appeal was pending, Fob James, Jr., pursuant to a general election held on November 8, 1994, succeeded Jim Folsom as Governor of Alabama. Governor James sought a writ of prohibition in this Court directing Judge Reese "to vacate his orders... of March 31, 1993, ... October 22, 1993, and December 3, 1993; to dismiss [the] actions for lack of subject-matter jurisdiction; and to exercise no further jurisdiction in [the] cases." Ex parte James, (no. 1940679). Petition for Writ of Prohibition, at 12. On April 10, 1995, we unconditionally denied the petition as it related to the liability aspect of this cause; we also denied the petition as it related to the remedy aspects, but noted that issues raised in that regard could be presented on appeal following the entry of a final order. We concluded that "because the trial court retained jurisdiction of this cause," the order entered on December 3, 1993, did not constitute a final judgment.[2] It is against the backdrop of this holding that we consider the arguments for intervention in this case.
I. Cases 1931030, 1931031, 1931149, and 1931150
Pinto seeks to intervene on behalf of three classes of persons involved with Alabama public schools. One class she describes as composed of "students who are enrolled or will be enrolled in statutory gifted programs in public schools in Alabama" ("Gifted-Student class"). Brief of Pinto Appellants, at 6-7. A second class she describes as composed of "students who are enrolled or will be enrolled in public school systems in Alabama that at a minimum are providing constitutionally adequate educational opportunities" ("General Student class"). Id. A third class she describes as composed of "parents of students enrolled or who will be enrolled in public schools in Alabama" ("Parent class"). Id. Anderton attempts to intervene on behalf of "taxpayers and citizens" of Alabama.
Both Pinto and Anderton contend that the classes they purport to represent are entitled, pursuant to Ala.R.Civ.P. 24(a), to participate in this action as a matter of "right." Rule 24(a) provides:
"Upon timely application, anyone shall be permitted to intervene in an action: (1) when a statute confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties."
Alabama courts have often explained that "as a general proposition, Rule 24 is to be liberally construed to allow intervention." Alabama Federal Savings & Loan Ass'n v. Howard, 534 So.2d 609, 612 (Ala.1988) (emphasis added); see also Hughes v. Newton, 295 Ala. 117, 324 So.2d 270 (1976); Finkenbinder v. Burton, 452 So.2d 880 (Ala.Civ.App. *899 1984). We can discern nothing about this litigation that would counsel a departure from this general rule of construction. On the contrary, the peculiar procedural posture of this litigation and the issues involved advise the Rule's most liberal application.
For example, few contemporary issues affect the citizens of Alabama as directly or as personally as the educationat taxpayers' expenseof future generations. It is undisputed that the persons who are presently parties to these actions have not identified the individuals Pinto and Anderton attempt to represent as constituting the distinct classes Pinto and Anderton have described. Thus, notwithstanding the protestations of the appellees,[3] logic dictates that to allow these individuals to represent their respective classes could, and would, much more adequately serve their interests, as well as those of all Alabama citizens in this extraordinary litigation, than would the present parties.
Also significant in this connection is the interlocutory nature of the trial court's remedy order. As we noted in our order in Ex parte James (see footnote 3 of this opinion), the trial court expressly "retained jurisdiction of this cause." As the following excerpts of the trial court's December 3, 1993, order clearly demonstrate, the court intended to oversee and direct the processes of education "reform" for an indefinite period:
"X. PUBLIC SCHOOL FUNDING MUST BE EQUITABLE AND ADEQUATE.
". . . .
"D. Periodic Review.

"The Defendants shall annually review all aspects of the school funding system, including the levels of adequacy and equity that it achieves, and including a report on the level of disparity created, if any; shall identify impediments that interfere with its success; and shall assure that State school revenues are raised and distributed fairly. Defendants shall report to the court and the parties on these subjects on an annual basis. Parties shall have 45 days to file objections with the court as to the operation of the funding system.
"XI. GENERAL PROVISIONS.
". . . .
"B. MonitoringThe parties shall meet to agree upon a procedure for monitoring the implementation of this Remedy Plan. Defendants shall submit a procedure no later than three months after the date of this Order. Parties shall have 45 days from the submission of this procedure to file objections with the court. Defendants shall bear all costs and expenses of monitoring the remedy plan including all the costs and expenses of plaintiffs' experts, consultants and plaintiffs' attorneys' fees.
"C. Continuing ObligationIf the provisions of this plan, and the implementation thereof, do not remedy the Constitutional and statutory deficiencies identified in the court's order of March 31, 1993, Defendants have a continuing obligation to remedy these deficiencies and plaintiffs may bring any failure to do so to the court's attention.

"D. Continuing Cooperation and Consultation Among the PartiesIn areas where this document calls for Defendants to make a submission to the court and provides all parties with an opportunity to file objections, Defendants are encouraged to meet with all parties in advance of the submission to minimize objections and cooperate in providing information as required."
(Emphasis added.)
These and numerous other provisions of the Remedy Order obviously contemplate perennial revision and reassessment of the progress of the process, the purpose of which is to convert a system that failed to "offer equitable and adequate educational opportunities to the schoolchildren of the state," Opinion of the Justices No. 338, 624 So.2d 107, 110 (Ala.1993) (emphasis added), into a system that succeeds in doing so. This ambitious *900 goal cannot be achieved without significantly impactingdirectly or indirectlyvirtually every Alabama citizen for years to come. It is difficult to understand, therefore, how, in this ongoing process, the supplementary ideas and viewpoints presented by Pinto and Anderton would impede the litigation's laudable goals or prejudice the present parties' interests.
Thus, we hold that Pinto and Anderton are entitled to intervene in the remedy phase of this unique litigation, as a matter of right, pursuant to Rule 24(a). That this holding does not extend to the liability phase, however, cannot be overemphasized. In other words, the intervenors will not be permitted to reopen or relitigate the question of the constitutionality of the educational system, which issue was adjudicated by an order dated March 31, 1993, and made final on June 9, 1993, pursuant to Rule 54(b), Ala. R.Civ.P. To the extent that the trial court's judgment in cases 1931030, 1931031, 1931149, and 1931150 denied intervention in the remedy phase, that judgment is reversed and the cause is remanded for further proceedings.

II. Cases 1931141 and 1931142
Although Swift initially appealed the denial of his motion to intervene, he has taken no active part in the appeal. Indeed, in a letter filed with this Court on July 5, 1994, Swift's counsel expressed the opinion that Swift lacked standing to intervene. Consequently, the appeals in cases 1931141 and 1931142 are dismissed.

III. Conclusion
In cases 1931030, 1931031, 1931149, and 1931150, the judgment is reversed and the cause is remanded for further proceedings consistent with this opinion. As to cases 1931141 and 1931142, the appeals are dismissed. All motions by the appellants not previously ruled on are denied.
1931030REVERSED AND REMANDED.
1931031REVERSED AND REMANDED.
1931141APPEAL DISMISSED.
1931142APPEAL DISMISSED.
1931149REVERSED AND REMANDED.
1931150REVERSED AND REMANDED.
ALMON, SHORES, KENNEDY, INGRAM, and COOK, JJ., concur.
MADDOX, J., concurs specially.
HOUSTON, J., concurs in the result.
BUTTS, J., recused.
MADDOX, Justice (concurring specially).
I concur in the holding that permits Pinto and Anderton to intervene in the remedy phase of this lawsuit, but in view of the fact that my colleagues, in reaching the result to permit intervention of these parties, state that "this holding does not extend to the liability phase," I desire to express some separate views on the doctrine of the separation of powers of government, which has been one of the paramount issues in this case, and which continues to be the subject of both legal and political debate, and which could continue to be an issue in the remedy phase.
Since this case was filed, several things have happened. Alabama has had three Governors. Many of the members of the Legislature who held office when the two actions that commenced these lengthy proceedings were filed are no longer in the Legislature, but the provisions of the Constitution have not changed. When the Justices of this Court were requested to give their individual opinions on one of the paramount issues in this case, they opined:
"Under our State constitution, `the powers of the government of the State of Alabama [are] divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are legislative, to one; those which are executive, to another; and those which are judicial, to another.' Art. III, § 42.
"The executive and legislative branches of the State have broad powers and responsibilities in the area of public education, but the powers of each branch of *901 government are bounded by the mandates and restraints of the constitution of the State of Alabama. This principle of separation of powers of government that is now included in the Alabama constitution was first decided in the famous case of Marbury v. Madison, 5 U.S. (1 Cranch) 137, 176-77, 2 L.Ed. 60 (1803). It is the province and duty of the judicial branch of government to interpret the constitution and to say what the law is, and an order issued by a court of competent jurisdiction that interprets the constitution is binding upon the Legislature unless the order is stayed or overturned by a higher court.
"Under the provisions of Amendment 328, Section 6.04, `the circuit court shall exercise general jurisdiction in all cases except as may otherwise be provided by law.' Included within the general jurisdiction of the circuit court is the power to decide whether the actions of the executive or legislative branches are consistent with the requirements of the fundamental law of the peopletheir constitution. In short, the circuit court has the power, and indeed the duty, when requested to do so in cases involving justiciable controversies, to interpret the constitution, and its interpretation, unless changed by a competent court having the power to overturn it, must be accepted and followed. See, 21 C.J.S. Courts § 3, pp. 11-12 (1940)."
Opinion of the Justices, No. 338, 624 So.2d 107, 109-110 (Ala.1993). (Emphasis added.)
I have the same opinion today that I had then regarding the separation of powers issue and the jurisdiction and power of a circuit court "to interpret the constitution." Although it might be considered somewhat simplistic, my view of the separation of powers doctrine is: "The Legislature makes the laws, the Executive executes the laws, the Judiciary interprets the laws."
Because the circuit court specifically retained jurisdiction, and because the question of the power of the circuit court, in the remedy phase, might, and probably will, present questions involving the division of powers between the Executive Branch and the Legislative and Judicial Branches of government, I concur to permit the intervention in this case. In fact, I believe it to be not only just and fair, but in accordance with law.
HOUSTON, Justice (concurring in the result).
I applaud the majority for permitting intervention. I write to express my reasons for permitting intervention.
The trial court held that (1) taxpayers, (2) citizens, (3) students who are or will be enrolled in public school systems in Alabama that at a minimum are providing constitutionally adequate educational opportunities, and (4) students who are enrolled in statutory "gifted programs" in public schools in Alabama are not entitled to intervene in this action because either they do not have "a direct, substantial, and legally protectable interest in the proceeding," Valley Forge Ins. Co. v. Alexander, 640 So.2d 925, 931 (Ala. 1994) (quoting an earlier case), or they were adequately represented by the parties to the action. I disagree; therefore, I concur in the result permitting intervention, and I write to express why I think these intervenors have "a direct, substantial, and legally protectable interest in [these proceedings]" and why they were not adequately represented by the parties to this action.
On March 23, 1993, a circuit judge elected only by the majority of the citizens in the 15th Judicial Circuit of Alabama, a circuit consisting of Montgomery County, held that the present system of public schools in Alabama violates the Alabama Constitution (Article I, §§ 1, 6, and 22 (phantom equal protection); Article I, § 13 (civil due process); and Article XIV, § 256), the United States Constitution (due process provision of the Fourteenth Amendment), and certain state statutes.
This case was bifurcated into liability and remedy phases. The March 31, 1993, order was made final pursuant to Rule 54(b), A.R.Civ.P., at the request of the plaintiffs. By that order, the circuit judge reached a result different from the result reached by the United States Supreme Court in San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). The trial court determined that *902 Rodriguez did not control, because, the court said, the question was "the nature of the right to education under the Constitution of Alabama." The trial court's order was not appealed.
One cannot read the trial court's March 31, 1993, liability order without wondering why this was not appealed to this Court (a Court composed of Justices elected from the state-at-large by taxpayers and citizens and parents of school students) and without concluding either that additional taxes must be imposed or that existing educational tax dollars must be redistributed to carry out the mandate of the trial court's order.
The dreaded "taxation without representation" may occur if the trial court, for whom the Anderton intervenors had no right to vote, attempts to impose taxes in the remedy phase of this trial to fulfill the duties imposed upon State officials in the liability phase. The assurance that there would be no taxation without representation was a concept upon which this nation was founded. If that concept is not sufficient to provide a class of taxpayers "a direct, substantial, and legally protectable interest in the proceeding," I do not know what is![4]
The power to tax is a legislative and not a judicial power. The Constitution of Alabama of 1901, Article III, § 43, provides:
"In the government of this state, ... the judicial [department] shall never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men."
If an assurance that our constitutional system of government remains our system of government is not sufficient to provide a class of citizens "a direct, substantial, and *903 legally protectable interest in the proceeding," I do not know what is!
Those students who are or who will be enrolled in public school systems in Alabama that at a minimum are providing constitutionally adequate educational opportunities and those students enrolled in statutory gifted programs in public schools, in my opinion, have "a direct, substantial, and legally protectable interest in the proceeding" that entitles them to at least attempt to preserve the educational systems that they have, in the event that the trial court, in the remedy phase, orders the redistribution of existing educational tax dollars.
My discussion of adequacy of representation is limited to the representation that the intervenors had at the time the trial court denied intervention. Since that time, Governor Fob James, Jr., has become a party to this action and he and Attorney General Jeff Sessions sought to appeal to this Court the liability and remedy orders issued by the trial court.
On April 10, 1995, in response to a petition filed by Governor Fob James, Jr., and Attorney General Jeff Sessions, this Court wrote:
"The petition of the Governor and the Attorney General for a writ of prohibition or, in the alternative, for writ of mandamus, having been submitted and considered by the Court,
"IT IS ORDERED that the petition is denied as to the order of the trial court dated March 31, 1993, establishing liability, because that order became final and appealable on [June 9, 1993,][5] and no appeal was taken within the time allowed;
"IT IS FURTHER ORDERED that as to other orders of the trial court subsequent to March 31, 1993, the petition is denied at this time; because the trial court retained jurisdiction of this cause, issues regarding other orders may be raised on appeal in accordance with the Alabama Rules of Appellate Procedure when such orders become final."
Ex parte James (No. 1940679, April 10, 1995, order not officially reported).
I do not think that any of the intervenors were adequately represented by the defendants, who were realigned as plaintiffs and who joined the plaintiffs' request for relief in the liability phase of this litigation; and who, after liability attached, were realigned as defendants. The defendants did not object to the plaintiffs' request that the liability order be made final pursuant to Rule 54(b), A.R.Civ.P., and did not appeal from the final order resulting from the Rule 54(b) procedure. The intervenors at no point have had a consistent laboring oar in this litigation.
Before I discuss why, in my opinion, the intervenors were not adequately represented in this action, I must state that I am an ardent supporter of public education. Thomas Jefferson wrote, "If a nation expects to be ignorant and free, in a state of civilization, it expects what never was and never will be."[6] I concur with this thought. I am most impressed with the definition of adequate educational opportunities in the March 31, 1993, order; and I do believe that all Alabama public schools should provide students an equal opportunity to be as unequal as they can be; to develop a sense of self worth and to acquire skills in oral and written communication; to acquire mathematical skills, scientific knowledge, knowledge of governmental processes, knowledge of economic, social, and political systems, and knowledge of history; and to acquire an introduction to all of the arts.
However, I am not a member of the legislative branch or the executive branch of government, whose responsibilities include providing for public education. I am a member of the judicial branch of government, which is enjoined by the Constitution of Alabama of 1901, Article III, § 43, to "never exercise the legislative and executive powers, or either of them." This limitation does not impinge upon the judicial duty to interpret the constitution and say what the law is. However, it is in the failure of the defendants, realigned as plaintiffs, and then, after the liability order *904 was entered, realigned as defendants, to challenge the trial court's interpretation of the constitution in the liability order and in the non-final remedy orders that causes me to hold that these intervenors were not adequately represented. San Antonio Independent School District v. Rodriguez, supra.
The trial court bases its authority to judicially declare constitutional educational rights on its interpretation of the Constitution of Alabama of 1901, §§ 1, 6, and 22, which it interprets to provide equal protection. It is my belief that judicial error can never create a nonexistent constitutional right to unconstitutionally increase judicial power and restrict the power of the legislative or executive branches of government. Sections 1, 6, and 22 of the Constitution of 1901 do not provide a right to equal protection under the law. The concept that they do was erroneously conceived by relying on an erroneous annotation to Article I, § 1, of the Constitution. What does § 6 of the Constitution have to do with education, or equality of education, or adequacy of education, or equal protection of the laws? Nothing.
Article I, § 6, provides:
"That in all criminal prosecutions, the accused has a right to be heard by himself and counsel, or either; to demand the nature and cause of the accusation; and to have a copy thereof; to be confronted by the witnesses against him; to have compulsory process for obtaining witnesses in his favor; to testify in all cases, in his own behalf, if he elects so to do; and, in all prosecutions by indictment, a speedy, public trial, by an impartial jury of the county or district in which the offense was committed; and he shall not be compelled to give evidence against himself, nor be deprived of life, liberty, or property, except by due process of law; but the legislature may, by a general law, provide for a change of venue at the instance of the defendant in all prosecutions by indictment, and such change of venue, on application of the defendant, may be heard and determined without the personal presence of the defendant so applying therefor; provided, that at the time of the application for the change of venue, the defendant is imprisoned in jail or some legal place of confinement."
This section addresses only rights of an accused in criminal prosecutions. It has absolutely nothing to do with education, equality of education, or adequacy of education. Certain rights are enumerated therein, but they are not applicable in the cases before us; there is no general equal protection provision contained in this section.
What does § 22 of the Constitution have to do with education, or equality of education, or adequacy of education, or equal protection of the laws? Nothing.
Article I, § 22, provides:
"That no ex post facto law, nor any law, impairing the obligations of contracts, or making any irrevocable or exclusive grants of special privileges or immunities, shall be passed by the legislature; and every grant or franchise, privilege, or immunity shall forever remain subject to revocation, alteration, or amendment."
What do ex post facto laws, or impairment of obligations of contracts, or irrevocable or exclusive grants of special privileges or immunities have to do with education, or equality of education, or adequacy of education, or equal protection? Absolutely nothing. There is nothing in § 22 that provides for equal protection under the law. None of the rights enumerated in § 22 is applicable to the cases before us. Likewise, no combination of §§ 6 and 22 can be construed to have anything to do with the equality or adequacy of education or generalized equal protection.
What does § 1 of the Constitution have to do with education, or equality of education, or adequacy of education, or equal protection of the laws? Article I, § 1, Constitution 1901, provides:
"That all men are equally free and independent; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty and the pursuit of happiness."
Nothing in § 1 pertains to equality or adequacy of education. Is it possible that § 1 alone clearly and unambiguously provides for equal protection of the law? "[A]ll men are equally free and independent." What does *905 "free" encompass? What does "independent" encompass?
"Free" is defined in Black's Law Dictionary 663 (6th ed. 1990) as:
"Not subject to legal constraint of another.
"Unconstrained; having power to follow the dictates of own will. Not subject to the dominion of another. Not compelled to involuntary servitude; used in this sense as opposed to `slave.'
"Not bound to service for a fixed term of years; in distinction to being bound as an apprentice. Enjoying full civic rights. Available to all citizens alike without charge; as a free school.
"Not despotic; assuring liberty; defending individual rights against encroachment by any person or class; instituted by a free people; said of governments, institutions, etc.
"Certain, and also consistent with an honorable degree in life; as free services, in the feudal law.
"Confined to the person possessing, instead of being shared with others; as a free fishery.
"Not engaged in a war as belligerent or ally; neutral, as in the maxim: `Free ships make free goods.'"
In the American Heritage Dictionary of the English Language 524 (1969), the adjective "free" is defined as:
"1. At liberty; not bound or constrained. 2. Discharged from arrest or detention. 3. Not under obligation or necessity. 4.a. Politically independent. Said of a country or nation. b. Governed by consent and possessing civil liberties: a free society. c. Immune to arbitrary interference by government or others: a free press."
(Emphasis in original.)
In Black's Law Dictionary 770, "independent" is defined as:
"Not dependent; not subject to control, restriction, modification, or limitation from a given outside source."
The adjective "independent" is defined in the American Heritage Dictionary, 668, among other ways that are clearly irrelevant to the cases before us, as:
"1. Politically autonomous; self-governing. 2. Free from the influence, guidance, or control of another or others; self-reliant."
Therefore, "equally free and independent" can mean, among other things, equally not subject to the legal constraint of another and equally self-governing; equally at liberty and not subject to control, restriction, or limitation from a given outside source; equally governed by consent and possessing civil liberties and free from the influence, guidance, or control of another. Consequently, the meaning of "equally free and independent" is unclear and ambiguous, and this phrase is not clarified or made less ambiguous by the phrases that follow it: "that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty and the pursuit of happiness."
Nothing in § 1 by itself, or when combined with §§ 22 and 6, clearly and unambiguously provides equal protection under the law.
Therefore, to resolve the ambiguity in § 1, one must construe it to arrive at the intent of the drafters, by considering extrinsic matters such as the wording of previous constitutions and the debates in the 1901 Constitutional Convention. Ex parte Bozeman, 183 Ala. 91, 63 So. 201 (1913); see Garner v. Covington County, 624 So.2d 1346, 1351-54 (Ala.1993).
What appears as § 1 of the Constitution of 1901 first appeared in the Constitution of 1875, where it was followed by § 2, which provided, in pertinent part, as follows:
"That all persons resident in this state... are hereby declared citizens of the State of Alabama, possessing equal civil and political rights."
(Emphasis added.) What was § 2 in the Constitution of 1875 first became a part of an Alabama Constitution in the Constitution of 1868. The first two sections of the 1868 Constitution provided:
"1. That all men are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness.

*906 "2. That all persons resident in this state, born in the United States, or naturalized, or who shall have legally declared their intention to become citizens of the United States, are hereby declared citizens of the state of Alabama, possessing equal civil and political rights and public privileges."
In the Constitution of 1875 the phrase "That all men are created equal" was deleted from § 1, and the phrase "That all men are equally free and independent" was substituted therefor. The remainder of § 1 was unchanged. All of § 2 remained in the Constitution of 1875 except the last three words, "and public privileges."
Therefore, it is evident that the drafters of the Constitution of 1868, which was drafted by a constitutional convention but then defeated by the Alabama electorate, and ratified by the Congress of the United States prior to the ratification of the 14th Amendment, felt that something more than the phrases "all men are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness" was needed to provide for equal protection, because this was followed by § 2, which provided that citizens of Alabama "possessed equal civil and political rights and public privileges."
It is also evident that the drafters of the Constitution of 1875 felt that something more than the phrases "all men are equally free and independent; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness" was needed to provide for equal protection, because this was followed by § 2, which provided that citizens of Alabama possessed equal civil and political rights.
Section 2 of the Constitution of 1875 was intentionally deleted from the Constitution of 1901, with the understanding that everything in § 2 was "covered already by the Fourteenth Amendment [to the United States Constitution] and we [the 1901 Constitutional Convention] could not change or alter it if we undertook to do so." Official Proceedings of the Constitutional Convention of 1901, page 1640.
The minutes of the Constitutional Convention of 1901 show that after a motion was made to adopt what was Article I, § 2, of the Constitution of 1875, as a section of the 1901 Constitution, there was a motion to amend the section. Official Proceedings of the Constitutional Convention 1901, pages 1622-23. After lengthy discussion (pages 1623-28), there was a motion "to lay the section on the table" (page 1628). This was discussed (pages 1628-34); and on the 37th day, the Convention was adjourned without action being taken on any of the motions (page 1634).
On the 38th day of the Convention, the motion to adopt § 2 of the 1875 Constitution and the proposed amendments to it were tabled upon a vote of 49 ayes and 42 noes (page 1642). Preceding this, Mr. Lomax, who the preceding day had moved for the adoption of § 2, stated: "We [the Committee on the Preamble and Declaration of Rights, page 1622] do not desire to get up a heated discussion about the meaning of words in the Declaration of Rights. We believe that everything in that particular section of the bill of rights [§ 2 above] is covered already by the Fourteenth Amendment [to the United States Constitution] and we could not change or alter it if we undertook to do so" (page 1640).
The Committee on the Preamble and Declaration of Rights accepted two proposed amendments to § 2 and asked for unanimous consent, to which objection was made (page 1640). Thereafter, the following transpired:
"MR. LOMAX: As the Convention refused to grant unanimous consent, I move that the section and the amendments be laid on the table.
"MR. PILLANS: Will the gentleman allow me to call his attention to one thing that may be material to be considered before that is done. Will he withdraw?
"MR. LOMAX: Yes.
"MR. PILLANS: It is simply this, the section as we find it in our last Code of this State, has appended to it a note, stating `the effect of this section is to place all persons natural and artificial on a basis of *907 equality in the courts.' Citing the case of South and North Railroad against Morris, 65th, 75th, 85th, 87th and 106th Alabama, etc., and see also citations to another section: `there can be no discriminative advantage bestowed by law between the parties to the same suit,' citing other authorities. `The statute against miscegenation is not a denial of equal civil and political rights to the races.' Now if it appear from that, very likely that is a clause that has some efficacy and meaning, and has force in protecting investments and corporate rights and perhaps individual rights in this State, against hasty and ill advised legislation.
"MR. WALKER: Will the gentleman allow a suggestion?
"MR. PILLANS: Yes.
"MR. WALKER: Isn't that purpose completely effected by the provision of the Fourteenth Amendment to the Constitution of the United States?
"MR. PILLANS: It is, possibly. I only wanted to say that I expect to vote against laying the section on the table for the reason that it can be amended and preserved.
". . . .
"MR. LOMAX: In reply to the suggestion of the gentleman from Mobile, I will state that an investigation which I made last night demonstrated the fact that this provision is not contained in any Constitutions at all, in the language in which it appears in our Constitution. It appears substantially in the following Constitutions: New York, Connecticut, Indiana, Minnesota, South Carolina and Virginia, and does not appear in the Constitution of any other State, except those named, and, as I say, it does not appear in this language in those Constitutions. I have no doubt, however, that everything contained in that section is covered by the Fourteenth Amendment, as I said before, and we could not possibly alter it if we undertook to do so. I think the section ought to stand as it is written, and as it was adopted unanimously by the convention of 1875, or else it ought to go out altogether, and therefore I renew my motion to table both the amendments and the section.
". . . .
"MR. LOMAX: ... I now renew my motion to table.
"Upon a vote being taken a division was called for, and by a vote of 49 ayes to 42 noes the section and the amendments were laid upon the table."
On the 46th day of the Convention, on motion of Mr. Lomax, the chairman of the Committee on the Preamble and Declaration of Rights, the Preamble and the Declaration of Rights (from which § 2 of the Constitution of 1875 had been deleted) were read a third time and adopted by the Convention by a vote of 116 ayes and 2 noes (pages 2254-60).
In Ex parte Southern Bell Tel. &. Tel. Co., 267 Ala. 139, 143, 99 So.2d 118, 121 (1957), Justice Stakely, writing for a unanimous court in a case that involved an issue that had been discussed during the 1901 Constitutional Convention, wrote:
"Although the debates of the constitutional convention are not binding on this court, they are persuasive, and the one in question is highly so."
So, also, is the discussion on equal protection during the Constitutional Convention highly persuasive for the proposition that the framers did not intend for the phrase "equally free and independent" to embrace equal protection of civil and political rights. Because the words "equally free and independent" are ambiguous, the proceedings of the Constitutional Convention are valuable in determining the meaning and purpose of that constitutional language. Hunt v. Hubbert, 588 So.2d 848 (Ala.1991). As the debates of the Constitutional Convention indicate, Alabamians are afforded equal protection under the 14th Amendment to the United States Constitution and not by any provision or provisions of the Constitution of Alabama of 1901.
This Court acknowledged this in Opinion of the Justices No. 102, 252 Ala. 527, 530, 41 So.2d 775, 777 (1949):
"We point out that there is no equal protection clause in the Constitution of 1901. The equal protection clause of the Constitution *908 of 1875 was dropped from the Constitution of 1901."
It is evident that the Constitutional Convention of 1901 purposefully deleted what was Article I, § 2, of the Constitution of 1875, from the Constitution of 1901.
Of course, all persons within the territorial limits of the State of Alabama have the rights specified in the Declaration of Rights (Article I) in the Alabama Constitution. Neither the legislative, the executive, nor the judicial department has the power to deprive any person or group of persons of any of these rights; however, equality of education is not among those enumerated rights.
In San Antonio Independent School District v. Rodriguez, supra, when the Texas system of education, which appears to be substantially similar to Alabama's, was challenged as violating the Equal Protection Clause of the United States Constitution, the United States Supreme Court held that "the Texas system impinges upon no substantive constitutional right or liberties," 411 U.S. at 62, 93 S.Ct. at 1311.
In these cases, the trial court, not heeding the wisdom of the Supreme Court of the United States, opted to strike down Alabama's educational system.
This Court, in City of Hueytown v. Jiffy Chek Co. of Alabama, 342 So.2d 761 (Ala. 1977), and Peddy v. Montgomery, 345 So.2d 631 (Ala.1977), erred in concluding that there was an equal protection clause in the Constitution of 1901. In City of Hueytown, the Court stated that §§ 1, 6, and 22 of the Constitution of 1901 combine to guarantee equal protection of the laws, without citation of authority or explanation. Later that same year, in Peddy v. Montgomery, the Court did tip its hand as to why the author of the opinion contended that §§ 1, 6, and 22 combine to guarantee equal protection, and in doing so, exposed the fact that unofficial annotations to Article I, §§ 1 and 22 of the Constitution (appearing in Ala.Code 1975, Vol. 1, pp. 79, 168 (1977) and appearing in Ala.Code 1940 (Recompiled 1958), Vol. 1, pp. 26, 89) rather than Pickett v. Matthews, 238 Ala. 542, 192 So. 261 (1939), were the source of this erroneous comment; even though the Peddy opinion stated:
"Any doubt about whether the Constitution of Alabama contained an equal protection provision was dispelled in Pickett v. Matthews [citation omitted]."
345 So.2d at 633.
This is an incorrect interpretation of Pickett v. Matthews, as even a cursory reading of Pickett v. Matthews shows that this Court knew that the 14th Amendment to the United States Constitution provided the equal protection guarantee for Alabama citizens:
"It is thought that to do so deprives one of `life, liberty, or property' without due process (section 6, Constitution), because such rights are inalienable under Section 1, and create a special privilege under Section 22, and violate the equal protection of the Fourteenth Amendment."
(Emphasis added.) 238 Ala. at 545, 192 So. at 264.
Unfortunately, the unofficial annotation to Article I, §§ 1 and 22, appearing in the Code version of the Constitution, erroneously summarized the holding in Pickett v. Matthews, supra, as:
"And sections 1, 6, and 22 taken together guarantee the equal protection of the laws."
That annotation is absolutely wrong. The annotation to § 1 was corrected in the 1994 Cumulative Supplement to the Code of Alabama. Ala.Code 1975, Vol. 1 (1994 Cum. Supp., p. 62). This Court in Pickett v. Matthews recognized that the 14th Amendment to the United States Constitution provided equal protection for Alabamians; that § 1 of the Alabama Constitution "protect[ed] persons as to their inalienable rights"; that § 6 of the Alabama Constitution "prohibit[ed] one from being deprived of his inalienable rights without due process"; and that § 22 of the Alabama Constitution "prohibit[ed] irrevocable or exclusive grants of special privileges or immunities." 238 Ala. at 545, 192 So. at 264. Yet, this Court in Peddy v. Montgomery interpreted Pickett v. Matthews as holding "that §§ 1, 6, and 22 of Article I of the Constitution, taken together, guarantee the equal protection of the laws."
*909 This is wrong.
To demonstrate that even "Homer nods,"[7]Peddy v. Montgomery, continued:
"In 1871, referring, of course, to an earlier constitution which contained the same provision as the 1901 version, this Court said:
"`... According to our constitution, "All men are created equal...."'

O'Neal v. Robinson, 45 Ala. 526, 534 (1871)."
(Emphasis added.) 345 So.2d at 633.
This also is wrong, as a comparison of the Constitution referred to in O'Neal and the 1901 Constitution shows:
Constitution of 1868 Constitution of 1901
Section 1. "All men This section was
are created equal." changed to: "That all
 men are equally free
 and independent."
Section 2. "That all This section was purposefully
persons resident in this deleted from
state ... are hereby the Constitution of
declared citizens of the 1901. Official Proceedings
State of Alabama, possessing of the Constitutional
equal civil and Convention,
political rights." 1901, pp. 1642, 2254-60.
There is no constitutional guarantee of equal protection under the present Alabama Constitution; and no constitutional restriction on the powers of government can be created by an erroneous judicial process that ignored the words of the case it relied on, that ignored the history of what happened during the Constitutional Convention of 1901, and that fails to acknowledge its error when its attention is directed to this error. In Moore v. Mobile Infirmary, 592 So.2d 156, 170-71 (Ala.1991), a plurality of this Court, to strike down a tort reform provision, attempted to prove that §§ 1, 6, and 22 of the Constitution of 1901 guarantee citizens of Alabama equal protection, by citing In re Dorsey, 7 Port. 293, 360-61 (Ala.1838), which was decided at a time when the Alabama Constitution of 1819 provided: "That all freemen, when they form a social compact, are equal in rights...." These words do not appear in the 1901 Constitution.
Judicial error cannot change the Constitution of 1901, the wording of former constitutions, or the minutes of the Constitutional Convention. Judicial error has created a Phantom of the Operatives. Promulgating that judicial error to hide judicial error is one thing; using that judicial error as precedent to continue to strike down acts of the legislature as violating a nonexistent constitutional provision or to permit taxes to be imposed upon Alabama citizens solely to comport with a nonexistent constitutional right, in my opinion, is a violation of the separation of powers doctrine; and, if by the violation of that doctrine a citizen's enjoyment of life, liberty, or property is impinged, it would also constitute judicial usurpation and oppression. Article I, § 35, Constitution of 1901.
The majority of the United States Supreme Court wisely noted in San Antonio Independent School District v. Rodriguez, 411 U.S. at 42-43, 93 S.Ct. at 1301-02:
"In addition to matters of fiscal policy, this case also involves the most persistent and difficult questions of educational policy, another area in which this Court's lack of specialized knowledge and experience counsels against premature interference with the informed judgments made at the state and local levels. Education, perhaps even more than welfare assistance, presents a myriad of `intractable economic, social, and even philosophical problems.' Dandridge v. Williams, 397 U.S. 471, at 487 [90 S.Ct. 1153, at 1163, 25 L.Ed.2d 491] (1970). The very complexity of the problems of financing and managing a statewide public school system suggests that `there will be more than one constitutionally permissible method of solving them,' and that, within the limits of rationality, `the legislature's efforts to tackle the problems' should be entitled to respect. Jefferson v. Hackney, 406 U.S. 535, at 546-47 [92 S.Ct. 1724, 1731, 32 L.Ed.2d 285] (1972). On even the most basic questions in this area the scholars and educational experts are divided. Indeed, one of the major sources of controversy concerns the *910 extent to which there is a demonstrable correlation between educational expenditures and the quality of educationan assumed correlation underlying virtually every legal conclusion drawn by the District Court in this case. Related to the questioned relationship between cost and quality is the equally unsettled controversy as to the proper goals of a system of public education. And the question regarding the most effective relationship between state boards of education and local school boards, in terms of their respective responsibilities and degrees of control, is now undergoing searching re-examination. The ultimate wisdom as to these and related problems of education is not likely to be divined for all time even by the scholars who now so earnestly debate the issues. In such circumstances, the judiciary is well advised to refrain from imposing on the States inflexible constitutional restraints that could circumscribe or handicap the continued research and experimentation so vital to finding even partial solutions to educational problems and to keeping abreast of ever-changing conditions."
(Emphasis added.)
Nonetheless, the trial court chose to enter this complex area. No appeal was taken from that decision, and the Alabama Judiciary is now involved in determining fiscal and educational policy. Certainly, taxpayers, citizens, and present and future school children whose education is at risk should be parties to help the judiciary in finding solutions to educational problems. I would reverse the trial court's order denying these parties the right to intervene; therefore, I concur in the result.
NOTES
[1] By October 1, White held the office of State finance director. In that office, he replaced James Rowell, who had replaced Robin Swift, who had resigned on September 30, 1991. White also was substituted for his predecessor as a defendant.
[2] The order is heretofore unpublished, but its full text is as follows:

"IT IS ORDERED that the petition is denied as to the order of the trial court dated March 31, 1993, establishing liability, because that order became final and appealable on July 21, 1993 [sic], and no appeal was taken within the time allowed;
"IT IS FURTHER ORDERED that as to other orders of the trial court subsequent to March 31, 1993, the petition is denied at this time; because the trial court retained jurisdiction of this cause, issues regarding other orders may be raised on appeal in accordance with the Alabama Rules of Appellate Procedure when such orders become final."
Our order stated that the trial court's March 31, 1993, order had become "final and appealable on July 21, 1993." Actually, as the statement of facts in this present opinion indicates, that March 31, 1993, order had become final, and therefore appealable, on June 9, 1993. On July 21, 1993, the 42-day appeal period expired, with no appeal having been taken.
[3] The Harper plaintiffs, for example, contend that the classes Pinto seeks to represent are adequately represented, because, they contend, the litigation as currently postured contains some, or all, of the individuals composing the proposed classes. See Brief of Harper, ACE, ADAP, and John Doe Appellees, at 15-27.
[4] Justice Kennedy wrote the following in his special writing in a 1990 case before the United States Supreme Court:

"Our statement in a case decided more than 100 years ago should apply here.
"`This power to impose burdens and raise money is the highest attribute of sovereignty, and is exercised, first, to raise money for public purposes only; and, second, by the power of legislative authority only. It is a power that has not been extended to the judiciary. Especially is it beyond the power of the Federal judiciary to assume the place of a State in the exercise of this authority at once so delicate and so important.' Rees v. City of Watertown, 19 Wall. 107, 116-117, 22 L.Ed. 72 (1874).
"The confinement of taxation to the legislative branches, both in our Federal and State Governments, was not random. It reflected our ideal that the power of taxation must be under the control of those who are taxed. This truth animated all our colonial and revolutionary history.
"`Your Memorialists conceive it to be a fundamental Principle ... without which Freedom can no Where exist, that the People are not subject to any Taxes but such as are laid on them by their own Consent, or by those who are legally appointed to represent them: Property must become too precarious for the Genius of a free People which can be taken from them at the Will of others, who cannot know what Taxes such people can bear, or the easiest Mode of raising them; and who are not under that Restraint, which is the greatest Security against a burthensome Taxation, when the Representatives themselves must be affected by every tax imposed on the People.' Virginia Petitions to King and Parliament, December 18, 1764, reprinted in The Stamp Act Crisis 41 (E. Morgan ed. 1952).
"The power of taxation is one that the Federal Judiciary does not possess. In our system `the legislative department alone has access to the pockets of the people,' The Federalist No. 48, p. 334 (J. Cooke ed. 1961) (J. Madison), for it is the Legislature that is accountable to them and represents their will....
"The operation of tax systems is among the most difficult aspects of public administration. It is not a function the Judiciary as an institution is designed to exercise. Unlike legislative bodies, which may hold hearings on how best to raise revenues, all subject to the views of constituents to whom the Legislature is accountable, the Judiciary must grope ahead with only the assistance of the parties, or perhaps random amici curiae. Those hearings would be without principled direction, for there exists no body of juridical axioms by which to guide or review them."
Missouri v. Jenkins, 495 U.S. 33, 67-71, 110 S.Ct. 1651, 1672-73, 109 L.Ed.2d 31 (1990) (Kennedy, J., concurring in part and concurring in the judgment, with Rehnquist, C.J., and O'Connor and Scalia, JJ., joining his opinion; the majority consisted of White, Brennan, Marshall, and Blackmun, JJ.). See "Taxation Without Representation: The Judicial Usurpation of the Power to Tax in Missouri v. Jenkins," 69 N.C.L.Rev. 741, 766 (March 1991); Judicial Taxation in Desegregation Cases, 89 Colum.L.Rev. 332, 341-42 (March 1989); "`No Taxation Without Representation... Unless Desegregation:' The Power of Federal Courts to Order Tax Increases to Desegregate Schools: Missouri v. Jenkins," 12 Hamline Journal of Public Law and Policy 191, 200 (Spring 1991).
[5] See note 3 to the per curiam opinion. This Court's order of April 10, 1993, inadvertently gave the date July 21, 1993.
[6] Letter to Colonel Charles Yancey (January 6, 1816).
[7] Horace's Ars Poetica ("Indignor quandoque bonus dormitat Homerus. I'm aggrieved when sometimes even excellent Homer nods.")