These consolidated appeals arise out of an action commenced by (1) the Alabama Association of School Boards ("AASB"); (2) the Pike County Board of Education; (3) the Board of School Commissioners of Mobile County; and (4) the Alabama Coalition for Equity, Inc. ("ACE"), against (a) Governor Don Siegelman, (b) State Finance Director Henry Mabry (the "Director"), and (c) State Comptroller Robert Childree (the "Comptroller").
The underlying dispute began on February 2, 2001, when the Director addressed a letter to Governor Siegelman, stating:
 "After much study and analysis by this department, the Department of Revenue and other financial experts, I regret to inform you that current estimated receipts to the Education Trust Fund for fiscal year 2001 (October 1, 2000 through September 30, 2001) appear to be insufficient to fund all appropriations at their current levels.
 "Therefore, in order to comply with the requirements of the Budget Act, Section 41-4-90, Code of Alabama (1975), I recommend that you authorize proration of all original and supplemental appropriations from the Education Trust Fund immediately in the amount of 6.2%."
That same day, the Governor addressed a letter to the Director, stating:
 "Based upon your information and advice, I hereby authorize under the *Page 571 
 authority of Section 41-4-90, Code of Alabama (1975), proration of all original and supplemental appropriations from the Education Trust Fund for fiscal year 2001 in the amount of 6.2%.
 "Please take all necessary actions in accordance with the Budget Act, the Budget Management Act and other applicable law to ensure that this directive is carried out immediately."
Thereafter, on February 7, 2001, a complaint was filed by the AASB, the Pike County Board of Education, the Board of School Commissioners of Mobile County, and the ACE, seeking declaratory and injunctive relief against the Governor, the Director, and the Comptroller (collectively, the "Executive Parties"). The complaint alleged that "the declaration of proration by [Governor] Siegelman on February 2, 2001, under the auspices of § 41-4-90 was an absolute, across the board proration of all funding for K-12 education [kindergarten through grade 12]." It sought a judgment declaring that Governor Siegelman's proration order violated various statutory provisions and constitutional guarantees and could not be implemented to prorate the funding of (1) the "Foundation Program" benefiting grades K-12;[2] (2) "transportation services"; or (3) "Special Schools," namely, the Alabama High School of Mathematics and Science, the Alabama School of Fine Arts, the Alabama School for the Blind and Deaf, and "K-12 programs provided by the Alabama Department of Youth Services" (collectively the "Programs"). In the alternative, it sought a declaration that the Governor's order could not "be applied to prorate funds allocable to [K-12] salaries." The complaint also sought an order enjoining the Executive Parties from prorating funding of the Programs, or, in the alternative, from prorating funding "for payment of salaries and benefits" for grades K-12.
Subsequently, various individuals and entities were allowed to intervene. Intervening as plaintiffs were Mary Harper, "suing as next friend of Deion Harper and Kerry Phillips" ("Harper"); and the Alabama Disabilities Advocacy Program ("ADAP").[3]
One intervenor on the defendants' side was the Joint Fiscal Committee of the Alabama Legislature (the "Joint Committee"). Also intervening as defendants were entities representing post-secondary education in various alignments or groupings. One group was composed of Jacksonville State University, the University of Montevallo, the University of North Alabama, the University of South Alabama, the Troy State University System, and the University of West Alabama (the "Regional Universities"). Another group was composed of Auburn University and the Board of Trustees of the University of Alabama. A third group was composed of Alabama State University and Alabama Agricultural *Page 572 
and Mechanical University. Throughout this opinion, the term "Universities" will be used to designate these three groups collectively.
Additionally, the Universities filed cross-claims for a declaratory judgment and injunctive relief. More specifically, they sought a judgment declaring that "the Executive Parties could not implement proration . . . in a manner which would treat them differently than [the institutions involved in K-12 education] or which would result in a percentage reduction of their appropriations exceeding 6.2%." They sought an order "enjoining the Executive Parties . . . from exempting funds appropriated for K-12 salaries prior to calculating proration and/or implementing proration in a manner which would cause the Universities to suffer a higher percentage reduction in appropriations than other agencies or entities including K-12."
On February 22, 2001, following a hearing, the trial court entered an order holding that the Constitution of Alabama guarantees "an equitable and adequate education to every child in Alabama," and that the implementation of the Governor's February 2, 2001, proration order would be inconsistent with that guarantee. Consequently, it preliminarily enjoined the Executive Parties from "implementing the February 2, 2001, proration order as applicable to funding of the [Programs]." The injunction was to become effective at 5:00 p.m. on February 27, 2001. The trial court delayed the implementation of the injunction in order to give the Legislature, which had been called into a special session by the Governor, time to address the proration/school funding issues. From that order, the Executive Parties, the Universities, and the Joint Committee appealed. Those appeals are represented by cases no. 1000951, 1000952, 1000953, 1000954, 1000959, 1000995, and 1000998.
On February 27, 2001, this Court stayed the order pending appeals of the cause. That same day, Governor Siegelman requested an advisory opinion of the Attorney General regarding the possible applicability of certain statutes, namely, Ala. Code 1975, § 16-6B-9, and Ala. Code 1975, § 16-13-144, in the context of proration ordered pursuant to § 41-4-90. His request stated in pertinent part:
 "Alabama Code § 16-13-144 states in pertinent part `No funds shall be transferred by any board of education from salary allocations to any other expenditure or for any other purpose. In times of proration, salaries shall not be prorated.' The language of § 16-6B-9 is identical to the language in § 16-13-144. Section 16-6B-9 was added in 1995 by Act 95-313, and the language quoted above was added to § 16-13-144 by Act 95-314. In other words, proration has not been declared in the E[ducation] T[rust] F[und] since the addition of these exemptions.
 "Prior to the enactment of the quoted language in these two code sections, when proration was declared, the entire amount of the ETF was cut across the board. It may have worked a change in the application of the proration statute. The language appears to require the Governor, in declaring proration, to remove salaries from the base amount to be prorated prior to calculating the proper percentage reduction. In other words, it appears that applying § 41-4-90
in light of §§ 16-6B-9 and 16-13-[144] would require the Governor to first subtract salaries from the ETF budget, and then prorate the remaining revenue as to all remaining appropriations."
(Emphasis added.)
The Attorney General responded the following day with an opinion, stating in substantive part: "The enactment of *Page 573 
[§§ 16-6B-9 and 16-13-144] clearly, statutorily, removes salaries thatare paid from the ETF from the budget items that may be prorated." (Emphasis added.)
On March 6, 2001, the Governor filed in the trial court a "Motion to Supplement the Record" on the ground that "events [had] occurred and circumstances [had] changed since the filing of Notice of Appeal." These "events" and "circumstances" were, the Governor stated, "the end of the extraordinary legislative session . . . without result, and the issuance of an opinion by [the] Attorney General regarding relevant statutes." The Governor's proposed supplement was his own affidavit, which stated in pertinent part:
 "After examining the relevant statutes, the Attorney General states that the 1995 language `clearly, statutorily, removes salaries that are paid from the ETF from the budget items that may be prorated.' Based on this interpretation, I believe that the language added in 1995 worked a fundamental change in the manner in which proration is properly applied to the ETF. As I interpret the Attorney General's opinion, salaries paid by local school boards with State funds are not to be included in the funds subject to proration. Those funds must be paid in full first. The remaining revenue must then be distributed on an equal basis to remaining recipients of ETF appropriations.
". . . .
 "The most recent revenue projections are not better than those available in January. Therefore, it is still necessary to limit expenditures from the ETF budget by an amount equal to 6.2% of the entire fund. Based on the Attorney General's opinion, I am prevented from applying proration to salaries paid with state funds by local school boards. Therefore, absent an order from the court to the contrary, it is my intention to instruct the relevant executive branch personnel to ensure that all funds allocated to salaries are sent to the local school boards in full. All remaining appropriations from the ETF will then be prorated accordingly, in equal percentages and across the board. This will result in proration of all non-K-12 salary appropriations of approximately 11.5%."
A week later, on March 13, 2001, the plaintiffs filed a motion styled "Motion of Plaintiffs and Plaintiff Intervenors to Modify Preliminary Injunction or to Issue New Preliminary Injunction." In that motion, the plaintiffs sought a "preliminary injunction postulated solely upon the court's construction and enforcement of § 16-6B-9 and §16-13-144(a), each of which explicitly states that with respect to K-12 funding `salaries shall not be subject to proration.'" The motion also asserted that the "[i]ssuance of an order enforcing these statutory mandates and exempting from proration the funds used to pay salaries of K-12 personnel would be in conformity with the Attorney General's Opinion issued on February 28, 2001." Consequently, the plaintiffs sought "a new Preliminary Injunction Order declaring . . . that § 16-6B-9 and § 16-13-144 . . . exempt from proration salaries of K-12 personnel and that in times of proration, funds allocated and distributed for payment of salaries cannot be subject to proration." In opposition, the Universities, on March 22, 2001, filed their own motion for a preliminary injunction "enjoining the Executive [Parties] . . . from removing K-12 salaries from the base amount to be prorated prior to calculating the proration percentage reduction."
On April 6, 2001, the trial court entered an order, providing in pertinent part: *Page 574 
 "By their present motion, Plaintiffs and the Plaintiff Intervenors ask this court to modify its original Injunction Order or to issue a new preliminary injunction narrower in scope than the court's first order.
". . . .
 "By their Motion to Modify, Plaintiffs argue that § 16-6B-9 and § 16-13-144(a) Ala. Code exempt from proration salaries of K-12 personnel. With respect to the [Programs] . . ., this court agrees with the construction of these statutes as urged by the Plaintiffs. Both of these statutes clearly and explicitly state that: `In times of proration, salaries shall not be subject to proration.' These statutes clearly mean that when the Governor declares proration pursuant to § 41-4-90, allotments for K-12 salaries shall be exempted from proration. That is, in computing the prorated amount of funds to K-12 entities, the [Executive Parties] must remove from the base funding to K-12 all funds which are appropriated/allocated for K-12 salaries before applying the proration percentage to whatever remaining funds are to be subjected to proration. This interpretation of these statutes is consistent with the Attorney General's Opinion of February 28, 2001, which has been filed of record. This court's conclusion that salaries for K-12 under the [Programs] are exempt from proration is reached on the basis of the application of these statutes. This court's conclusion that salaries for K-12 under the [Programs] are exempt from proration is not reached on the constitutional basis underlying this court's injunction order of February 22, 2001. . . . However, this court acknowledges that Plaintiffs continue to assert claims based on the constitutional issues outside of the context of the preliminary stage of this litigation."
(Emphasis added.) The trial court then preliminarily enjoined the Executive Parties from "implementing the February 2, 2001, Proration Order as applicable to funding, appropriations, . . . or disbursements for K-12 education utilized for payment of salaries in connection with the [Programs]." It also denied the injunctive relief requested by the Universities.
From the April 6 order, the Executive Parties, the Universities, and the Joint Committee appealed that portion granting injunctive relief. Additionally, the Universities appeal the denial of their request for injunctive relief. These appeals are represented by cases no. 1001233, 1001234, 1001239, 1001240, 1001241, 1001270, and 1001300. Preliminarily, we must resolve issues created by the pendency of the parallel appeals.
 I. The Grant of Injunctive Relief A. The February Injunction
The plaintiffs urge us to dismiss the appeals from the February injunction, contending that the issues presented therein are moot. Specifically, they refer to the April injunction as the "Modified Order," and assert that the February 22 injunction "is no longer in effect,"Brief of Appellee AASB, et al., at 32. They contend, in other words, that the February injunction has been replaced and "superseded" by the April injunction. Id. at 33.
The plaintiffs contend, and we agree, that the April injunction differs from the February injunction in two important respects. First, they are based on different legal theories. The theory underlying the February injunction is that the Governor's February 2 proration order violates rights guaranteed to children of K-12 by the Alabama Constitution. By contrast, the April injunction rests expressly and exclusively upon the claim that the Governor's *Page 575 
February 2 proration order violates § 16-6B-9 and § 16-13-144. Second, the April injunction is narrower than the February injunction. While the February injunction exempts from the proration order all
funding of the K-12 Programs, the April injunction exempts only funds allocable to salaries in the K-12 Programs. On similar grounds, the Executive Parties also urge us to dissolve the February injunction.[4]
In that respect, the position of the Executive Parties parallels the position of the Universities, which also urge us to dissolve the February injunction. The Joint Committee, in its brief to this Court, addresses only the April injunction. Thus, the February injunction is championed byno one, and the Executive Parties, the only parties to whom it was directed, do not consider themselves bound by it. Brief of ExecutiveParties, at 43-44. "Since the [February injunction] no longer controls," the plaintiffs contend, "any affirmance or reversal of the [February injunction] by this Court is unnecessary and would not grant effectualrelief to any party." Brief of Appellee AASB, et al., at 33 (emphasis added). The plaintiffs are claiming nothing under it and the Executive Parties do not consider it binding. During the oral argument of this case, it was conceded by all that no party is claiming any benefit under the February injunction. More specifically, the plaintiffs conceded that they do not intend to invoke the February injunction in the future. As stated in the April injunction, the plaintiffs have decided to raise "the constitutional issues outside of the context of the preliminary injunction stage of this litigation." It is clear that the plaintiffs have abandoned the constitutional issues as a ground for preliminary injunctive relief. As to the February injunction, therefore, there is an absence of adversity of the sort necessary to constitute a justiciable controversy.
A number of principles applicable to this dispute were articulated long ago:
 "The necessary requisite to appellate jurisdiction is the existence of an actual controversy; therefore it is not within the province of this court to decide abstract or hypothetical questions, which are disconnected from the gravity of actual relief, or from the determination of which no practical result can follow. Nor is it the province of this court to consider a fictitious case, submitted merely for the purpose of testing the right to do a particular thing.
 "The general rule is, if pending an appeal, an event occurs which renders it impossible for the appellate court to grant any relief, the appeal may be dismissed. There are many instances in which such condition may arise. It may arise by the act of the appellant himself. Woodruff v. Austin, 16 Misc. 543, 38 N.Y.S. 787, or it may likewise arise by the act of the appellee, as where, pending the appeal, he does, or relinquishes the right to do, some act in respect to which the appeal was taken. Wallingford v. Benson, 17 S.C. 591; Foote v. Smith, 8 Wyo. 510, 58 P. 898; 2 Cent. Dig. Appeal and Error, § 70 et seq. The condition may also arise from the act of the court a quo, that is to say, from some order or judgment in the case pending the appeal, which is made by the court, which renders the determination of the questions presented by the appeal unnecessary. Paris Electric Light Co. v. Martin (Tex.Civ.App.) 31 S.W. 243; 2 Cent. Dig. Appeal and Error, § 71 et seq. It may also arise by an act *Page 576 
 of law. Kidd v. Morrison, 62 N.C. 31. And it has been held that mere lapse of time may create this condition. 2 Cent. Dig. supra. Similarly it arises where a litigation has ceased to be between parties having adverse interests, etc. It has also been held, where all substantial interest in the controversy has been parted with or extinguished, the court will not hear the appeal merely to determine the rights to costs. Randolph v. Rosser, 7 Port. 249 [(Ala.)]."
Caldwell v. Loveless, 17 Ala. App. 381, 382, 85 So. 307, 307-08 (1920) (emphasis added). In this case, a "condition" has arisen by act of court during the pendency of the appeals "render[ing] the determination of the questions presented by the appeal unnecessary," namely, the entry of the April injunction, which modified and narrowed the earlier order.
More recently, this Court stated that in order to present a justiciable controversy, "the parties must be damaged and seeking a remedy, not justadvice." State ex rel. Baxley v. Johnson, 293 Ala. 69, 75, 300 So.2d 106,111 (1974) (emphasis added) (dismissing the appeal of the plaintiff Attorney General and the cross-appeal of the defendant Superintendent of Banks due to the absence of adversity in their positions in the litigation). Elsewhere, this Court explained: "Not only must the plaintiff prove his tangible interest in obtaining a judgment, but the action must be adversary in character, that is, there must be a controversy between the plaintiff and a defendant . . . having an interest in opposing his claim." Reid v. City of Birmingham, 274 Ala. 629,639, 150 So.2d 735, 744 (1963) (internal quotation marks omitted).
Despite the fact that the Universities claim nothing under the February injunction, but, rather, oppose it, they urge this Court to consider — for the purpose of rejecting — the constitutional theories on which it was based. In this connection, the Executive Parties observe: "It is clear that the Universities seek to breathe life back into the [February injunction], for the sole purpose of killing it on appeal." Brief of Executive Parties, at 42. Under the posture of this case, the Executive Parties' observation is irrefutable. No party in thisdispute claims anything based on the rationale of the February injunction. The Universities urge us to address the constitutional rationale only to reverse an order which is now opposed by everyone in the case. Thus, as to the constitutional issues themselves, there is no adversity.
This Court "will not . . . allow the judiciary of this state to become a political foil, or a sounding board for topics of contemporary interest." Ex parte State ex rel. James, 711 So.2d 952, 962 (Ala. 1998) (dismissing the appeal of the State of Alabama for lack of adversity) (plurality). Because the April injunction rendered the February injunction without force or effect, the appeals from the February injunction present no justiciable controversy. Therefore, the injunction is vacated and the appeals in cases no. 1000951, 1000952, 1000953, 1000954, 1000959, 1000995, and 1000998 are dismissed.
 B. The April Injunction
Unlike the February injunction, the April injunction has proponents, as well as opponents. The Universities and the Joint Committee urge us to reverse the order of the trial court and dissolve the injunction. The plaintiffs, on the other hand, urge us not to disturb the injunction, but to affirm the order. Thus, as to the April injunction, there is true adversity. *Page 577 
The sole basis for the April injunction is a single sentence: "In times of proration, salaries shall not be subject to proration." As the April injunction order noted, this sentence first appeared in two statutes enacted in 1995, namely, Act No. 95-313, § 9, 1995 Ala. Acts 620; and Act No. 95-314, § 27, 1995 Ala. Acts 634 (hereinafter "the 1995 directive"). Act No. 95-314, § 27, amended former § 16-13-144(a). Act No. 95-313, § 9, was codified as § 16-6B-9.
On its face, the language seems innocuous. However, it is theapplication of the 1995 directive that forms the core of this dispute. Two possible meanings have emerged with significant consequences to the parties.
Under one interpretation, the language is directed to the Governor. The April injunction order explains that interpretation as follows:
 "These statutes clearly mean that when the Governor declares proration pursuant to § 41-4-90, allotments for K-12 salaries shall be exempted from proration. That is, in computing the prorated amount of funds to K-12 entities, the [Executive Parties] must remove from the base funding to K-12 all funds which are appropriated/allocated for K-12 salaries before applying the proration percentage to whatever remaining funds are to be subjected to proration."
(Emphasis added.) In other words, the Governor does not prorate funds that are allocable to salaries. This is the interpretation adopted, of course, by the plaintiffs, and, since the issuance of the Attorney General's opinion of February 28, 2001, by the Executive Parties.
Under the second interpretation, the directive is to local schoolboards. Under this view, the Governor does not "remove from the base funding to K-12" any amount representing salaries. In other words, the Governor does prorate funds that are allocable to salaries. Under this construction, the 1995 directive merely orders the local school boards not to spend "state appropriations in a manner that would result in employee salaries not being paid in full." Brief of Appellants, theUniversity of Alabama and Auburn University, at 13. Otherwise stated, the 1995 directive "regulates the expenditure of funds by local school boardsafter the funds have been received from the State; they do not regulate how the state executive officials determine the amount of funds to distribute to local boards. The statutes are, in short, directed at local disbursement, not state budgeting." Id. at 12 (emphasis in original). Under the first interpretation, the Universities' financial burden in times of proration is heavier than under the second interpretation. Thus, in order to resolve this dispute, we need only determine whether the 1995 directive is to the Governor, or to the local school boards.
Resolution of the issue requires consideration of other statutes binding on the Governor "in times of proration," such as pertinent provisions of the "Budget and Financial Control Act" of 1932, codified asamended at Ala. Code 1975, §§ 41-4-82 to -96 (the "Budget Act"). Section 41-4-90 provides:
 "No appropriations made by the Legislature shall be available for expenditures until allotted as provided for in Section 41-4-91. All appropriations, except per capita appropriations now in force or hereafter made to eleemosynary and correctional institutions and the Alabama School for the Deaf and Blind, located at Talladega, Alabama, which appropriations shall remain in full force and effect and be payable and disbursed as now provided by law, are hereby declared to be maximum, conditional and proportionate appropriations, *Page 578 
 the purpose being to make appropriations payable in full in the amounts named only in the event that the estimated budget resources during each budget year of the period are sufficient to pay all of the appropriations for such year in full. The Governor shall restrict allotments to prevent an overdraft or deficit in any fiscal year for which appropriations are made by prorating without discrimination against any department, board, bureau, commission, agency, office or institution of the state, the available revenues among the various departments, boards, bureaus, commissions, agencies, offices and institutions of the state. In other words, said appropriations shall be payable in such proportion as the total sum of all appropriations bears to the total revenues estimated by the Department of Finance as available in each of said fiscal years. The purpose of this provision is to insure that there shall be no overdraft or deficit in the several funds of the state at the end of any fiscal year, and the Governor is directed and required so to administer this article to prevent any such overdraft or deficit."
(Emphasis added.) Section 41-4-96 provides in pertinent part: "A refusal to perform any of the requirements of this article or an improper or illegal performance of any requirement of this article by the Governor shall make him subject to impeachment." "The [A]ct was designed to make the state operate within its income." Southern Indus. Inst. v. Lee,234 Ala. 404, 406, 175 So. 365, 366 (1937).
The Executive Parties are further constrained by the Alabama Constitution, which provides in part:
 "To prevent further deficits in the state treasury, it shall be unlawful from and after the adoption of this amendment for the state comptroller of the state of Alabama to draw any warrant or other order for the payment of money belonging to, or administered by, the state of Alabama upon the state treasurer, unless there is in the hand of such treasurer money appropriated and available for the full payment of the same. In case there is, at the end of any fiscal year, insufficient money in the state treasury for the payment of all proper claims presented to the state comptroller for the issuance of warrants, the comptroller shall issue warrants for that proportion of each such claim which the money available for the payment of all said claims bears to the whole, and such warrants for such prorated sums shall thereupon be paid by the state treasurer. At the end of each fiscal year all unpaid appropriations which exceed the amount of money in the state treasury subject to the payment of the same after the proration above provided for, shall thereupon become null and void to the extent of such excess. Any person violating any of the provisions of this amendment shall, on conviction, be punished by a fine of not exceeding five thousand dollars, or by imprisonment in the penitentiary for not more than two years, one or both, at the discretion of the jury trying the same, and the violation of any provisions of this amendment shall also be ground for impeachment."
Ala. Const. 1901, Amend. 26 (emphasis added). As the AASB states it, "the heart of the controversy between the [plaintiffs] and the Universities is the interplay between Amendment 26 and [§ 41-4-90], on the one hand, and, on the other hand, the [1995 directive]." Brief of Appellees, theAASB, at xxiv.
The AASB explains the operation of proration upon the basic school-funding process as follows: *Page 579 
 "[Section 41-4-90] recognizes that state governments' funding process involves various steps commencing with the passage of a budget whereby funds are `appropriated' followed then by the disbursement of these appropriations through the mechanism of `allotments.' An allotment is simply the process through which appropriated funds are `allotted' or disbursed to various departments of state government to be used for payment of such items as salaries, utilities, purchase of supplies, etc.
 "[Section 41-4-90] recognizes that the Legislature can make appropriations in such amounts as it deems proper for state agencies but that these appropriations are conditional in the sense of being paid in full `only in the event that the estimated budget resources during each budget year of the period are sufficient to pay all of the appropriations for each year in full.' It is only when the amount appropriated by the Legislature in the budget exceeds the state's actual revenues that the Governor must intercede through the device of proration. In that instance, according to [§ 41-4-90], the Governor `shall restrict allotments to prevent an overdraft or deficit in any fiscal year for which appropriations are made. . . .' Thus, proration relates to restricting the `allotments' of the funds which had previously been appropriated to state agencies or departments.
 "When the Governor declares proration, he reduces the funds which are sent to the various departments; he does not reduce how these funds are ultimately disbursed to end users. In other words, in times of proration, funds which have been appropriated to state agencies to pay electric bills, salaries, or office supplies (whether earmarked or not), will be cut as a consequence of proration but the state agencies must still pay in full the utility bills, the salaries and the bills for office supplies. The parties are in agreement that historically, in times of proration, salaries paid to K-12 teachers have never been cut while the funds disbursed to the local boards to pay these salaries have been reduced."
Brief of Appellees, the AASB, at xxiv-xxvi (emphasis added).
Thus, the plaintiffs concede that Amendment 26 and § 41-4-90facially require the Executive Parties to "restrict allotments `by prorating without discrimination . . . the available revenues among the various [state agencies].'" Brief of Appellees, the AASB, at xxvi. However, they rely on dicta in two of this Court's cases, namely, Folsomv. Wynn, 631 So.2d 890 (Ala. 1993), and Abramson v. Hard, 229 Ala. 2,155 So. 590 (1934), for the proposition "that proration of funding cannot be ordered . . . for services which the Legislature has exempted from proration." Brief of Appellees, the AASB, at xxvi. This argument misses the point. The point is not whether the Legislature could exempt K-12 salaries from proration, but whether, in enacting the 1995 directive, itdid so.
The intent of the Legislature is the polestar of statutory construction. Richardson v. PSB Armor, Inc., 682 So.2d 438, 440 (Ala. 1996); Jones v. Conradi, 673 So.2d 389, 394 (Ala. 1995); Ex parteJordan, 592 So.2d 579, 581 (Ala. 1992). Among the parties in this action contending that the Legislature did not intend, by its 1995 directive, to authorize the Governor to exempt from proration any funds allocable to K-12 salaries is the Joint Committee.
As stated above, the Joint Fiscal Committee of the Alabama Legislature moved to intervene, arguing that its intervention was necessary "so that the separation of powers [might] be maintained adequately *Page 580 
and properly and [so that] the members of the Joint Fiscal Committee [could] present the Legislature's position on these issues." The Joint Committee was permitted to intervene, and it appealed from the April injunction "on behalf of the State Legislature."
The Joint Committee first contends that the Legislature has the constitutional authority to "direct the Governor to exclude any appropriations (salaries or otherwise) from the calculations of proration" by simply amending § 41-4-90. Brief of Appellee, the JointCommittee, at 4. It insists, however, that it has not done so. In support of this contention, it cites Act No. 2000-594, 2000 Ala. Acts 1097, in which the Legislature made its "appropriations for the support, maintenance and development of public education in Alabama . . . for the fiscal year ending September 30, 2001" (the "Appropriations Act"). Section 2(a) of the Appropriations Act provides:
 "The appropriations provided for in this act shall be paid from funds in the State Treasury to the credit of the Education Trust Fund . . . and are hereby made for the support of public education in Alabama for the fiscal year ending September 30, 2001, and the appropriations herein made shall be subject to the provisions, terms, conditions and limitations of the Budget and Financial Control Act (Code of Alabama 1975, Sections 41-4-80 et seq.), the provisions of the Budget Management Act of 1976 (Code of Alabama 1975, Sections 41-19-1 et seq.), and shall be in the amounts hereinafter specified."
(Emphasis added.) In other words, appropriations for the current fiscal year are expressly subject to the proration procedures set forth in § 41-4-90, the general proration statute, which, all parties concede, requires the Governor to "restrict allotments . . . by prorating without discrimination . . . the available revenues among the various [state agencies]." There is no mention of § 16-6B-9, or §16-13-144(a), which, the plaintiffs and the Executive Parties insist, direct the Governor to exempt from proration any funds allocable to K-12 salaries. If the Legislature had intended, as the plaintiffs and the Executive Parties contend, to provide an exemption for salaries in §16-6B-9, or § 16-13-144(a), it could have said so when it expressly made its appropriations subject to the general proration scheme. It did not do so. The absence of any such legislative intent is buttressed by the fact that every education appropriations act since passage of the 1995 directive has contained the identical "subject-to" provision. See Act No. 95-748, 1995 Ala. Acts 1700; Act No. 96-770, 1996 Ala. Acts 1361; Act No. 97-856, 1997 Ala. Acts 145; Act No. 98-504, 1998 Ala. Acts 1123; and Act No. 99-434, 1999 Ala. Acts 798.
Next, the Joint Committee and the Universities contend that thecontexts in which the 1995 directive appears clearly demonstrate that it does not bind the Governor, but, rather, the local boards of education. We agree with this contention. We note that the 1995 directive is actually coupled with another sentence in both § 16-6B-9 and §16-13-144(a). That sentence states: "No funds shall be transferred by anyboard of education from salary allocations to any other expenditure or for any other purpose." (Emphasis added.) Thus, when read together, the 1995 directive and its appended counterpart state: "No funds shall be transferred by any board of education from salary allocations to any other expenditure or for any other purpose. In times of proration,salaries shall not be subject to proration." (Emphasis added.) Indeed, these two sentences compose § 16-6B-9 in toto. *Page 581 
It is clear to the objective mind that the term "salaries" in the 1995 directive is synonymous with the term "salary allocations" in the preceding sentence. "Like terms in related statutes are presumed to have the same meaning, unless a different intent is manifest." Kilgore v.Swindle, 219 Ala. 378, 380, 122 So. 333, 335 (1929).
"Salary allocations" are not made at the state level. The Joint Committee points out: "Alabama has a program based budget, not a lineitem budget." Brief of Appellant, the Joint Committee, at 5 (emphasis added). In other words, "there is no line item in the Appropriations Act for salaries." Brief of Appellants, the Regional Universities, at 85. Similarly, the plaintiffs have conceded that "[w]hen the Governor declares proration, he [merely] reduces the funds which are sent to the various departments; he does not reduce how these funds are ultimatelydisbursed to end users." Brief of Appellees, the AASB, at xxv (emphasis added). In other words, the Executive Parties do not "allocate" salaries. See Act No. 95-314, § 2(b)(1)d. ("The local board of education shall allocate state and local foundation program funds to each school in an equitable manner. . . ."), codified at Ala. Code 1975, § 16-13-231(b)(1)d. The language in the sentence preceding the 1995 directive is plainly directed to "any board of education," not to the Governor, or any other Executive Party, concerning a process that transpires on a local level. It logically follows that the 1995 directive, although phrased slightly differently, is aimed at the sameentities, namely, "any board of education," and addresses the same local process. The purpose of the 1995 directive is, therefore, to emphasize that "in times of proration," local school boards may not transfer funds "from salary allocations to any other expenditure or for any other purpose."
Indeed, the 1995 directive is merely a restatement of a provision in the pre-1995 version of § 16-13-144(a). The pre-1995 version declared: "During years in which proration is declared, local city and county boards of education shall have authority to transfer expenditures between and among line item categories, provided that no funds shall betransferred from salaries to other line item categories." (Emphasis added.)
It is undisputed that before Act No. 95-314 amended § 16-13-144(a), local school boards were not prorating salaries, but that the Governorwas prorating appropriations at the State level. In light of the history of the text of § 16-13-144(a) and of the practice at the local and State levels, we regard the Legislature's passage of Act No. 95-314 as a mere reaffirmation of the prohibition against transferring funds allocated for salaries "to any other expenditure." Like its pre-1995 predecessor, the 1995 directive applies to "line-item" transfers by the local boards. It does not apply to the activities of the Executive Parties at the State level.
The Joint Committee contends that Acts No. 95-313 and 95-314 "dealentirely with local boards of education in their areas of programming and budgeting and not in Section 41-4-90 which deals with the proration of state appropriations." Brief of Appellant, the Joint Committee, at 7 (emphasis in original). Consideration of the 1995 directive in the context of the acts in which it was included supports this contention. For example, as indicated in the title, Act No. 95-313, the "Education Accountability Act," was enacted, among other things, to "establish an accountability plan which shall be overseen by the State Board of Education; . . . to establish certain requirements for the development of school budgets and to provide that school *Page 582 
allocations shall be budgeted and expended at the classroom level; [and] to restrict the use of funds allocated for salaries." (Emphasis added.)
The first sentence in § 16-13-144(a) is addressed to the "local board[s] of education." Specifically, it states:
 "No local board of education shall spend or obligate itself to spend more money in any fiscal year than the estimate of income available to that board of education for that year, plus balances on hand at the beginning of the fiscal year, which estimate shall be approved by the State Superintendent of Education, if the excess expenditure or excess obligation to spend results in a deficit for that fiscal year. . . ."
The next subsection, § 16-13-144(b), is also directed to "local board[s] of education," providing a penalty for violation of subsection (a). It authorizes the State Board of Education to "reduce in the succeeding fiscal year the allotment from the Foundation Program Fund to which the local board of education is otherwise entitled an amount equal to one-fourth of the deficit." Subsection (c) is directed to "local superintendent[s]," providing penalties for "purposely misrepresent[ing]" to the "local board of education or to the State Superintendent of Education . . . the amount of the deficit or obligations outstanding of his or her local board of education."
In construing statutes, this Court does not interpret provisions in isolation, but considers them in the context of the entire statutory scheme. Ex parte Employees' Retirement Sys. of Alabama, 644 So.2d 943,945 (Ala. 1994); Alabama Farm Bureau Mut. Cas. Ins. Co. v. City ofHartselle, 460 So.2d 1219, 1225 (Ala. 1984); Darks Dairy, Inc. v. AlabamaDairy Comm'n, 367 So.2d 1378, 1380 (Ala. 1979) (courts "must look to the entire Act instead of isolated phrases or clauses"). Considering the 1995 directive in the context of the acts in which it appeared compels the conclusion that it speaks, not to the Governor, but to the local school boards.[5] Had the Legislature intended to remove K-12 salaries from the base amount to be prorated by the Governor, it could easily have said so. It did not do so, however, and we are not at liberty to rewrite the statutes. Reed v. Board of Trustees for Alabama State Univ., 778 So.2d 791,794 (Ala. 2000); Pool v. State, *Page 583 570 So.2d 1260, 1263 (Ala.Crim.App.), aff'd, 570 So.2d 1263 (Ala. 1990).
In short, the trial court erred in its construction of the 1995 directive and in enjoining the Executive Parties on the basis of that construction. The April 6 order is, therefore, reversed.
 II. The Denial of Injunctive Relief
The Universities sought to enjoin the Executive Parties "from implementing proration in a manner which excludes funds appropriated for K-12 salaries prior to calculating the proration percentage." In granting the plaintiffs' motion for a preliminary injunction, the trial court denied the Universities' motion. The Universities now ask this Court to reverse the order denying their motion and remand the cause "with instructions to the court below to grant the relief [they] requested." For a number of reasons, we decline to instruct the trial court to enjoin the Chief Executive Officer of the State in the performance of his constitutional and statutory duties.
First, in vacating the February injunction and reversing the April injunction, we have placed the parties in the positions they occupied at the outset of this litigation. The order in effect at that time was the Governor's proration order of February 2, in which he proposed to do precisely what the Universities seek. In light of today's opinion, it cannot be presumed that he will deviate from his original order.
The Governor explained in his March 6 affidavit that he considered himself "bound" by the Attorney General's opinion as he understood it. Specifically, the Governor interpreted the opinion to say that the 1995 directive "worked a fundamental change in the manner in which proration is properly applied to the ETF." Although he expressed his intention "to instruct the relevant executive branch personnel to ensure that all funds allocated to salaries are sent to the local school boards in full," his intention was made subject to "an order from the court to the contrary."
Today's opinion is such an order, that is, we hold that the Attorney General's opinion, at least as it was understood by the Governor, is incorrect. At this point, we will do no more, for "[c]ourts, possessed of neither the purse nor the sword, are generally reluctant to issue orders they cannot enforce." Ex parte James, 713 So.2d 869, 893 (Ala. 1997) (Maddox, J., concurring in part and dissenting in part).
The sanctions in § 41-4-90 and § 41-4-96 for violations of the proration statute would seem to render superfluous any injunction directed to the respective Executive Parties. Because of the Governor's February 2 proration order, the Universities have no basis for a complaint.
In summary, the appeals in cases no. 1000951, 1000952, 1000953, 1000954, 1000959, 1000995, and 1000998 are dismissed, and the February injunction is vacated. In cases no. 1001233, 1001234, 1001239, 1001240, 1001241, 1001270, and 1001300, the order is reversed insofar as it granted injunctive relief, and the April injunction is dissolved. Further, in cases no. 1001233, 1001234, 1001239, 1001240, and 1001241, to the extent it denied injunctive relief, the order is affirmed.
1000951 — VACATED; APPEAL DISMISSED.
1000952 — VACATED; APPEAL DISMISSED.
1000953 — VACATED; APPEAL DISMISSED.
1000954 — VACATED; APPEAL DISMISSED.
1000959 — VACATED; APPEAL DISMISSED.
1000995 — VACATED; APPEAL DISMISSED. *Page 584 
1000998 — VACATED; APPEAL DISMISSED.
1001233 — AFFIRMED IN PART; REVERSED IN PART.
1001234 — AFFIRMED IN PART; REVERSED IN PART.
1001239 — AFFIRMED IN PART; REVERSED IN PART.
1001240 — AFFIRMED IN PART; REVERSED IN PART.
1001241 — AFFIRMED IN PART; REVERSED IN PART.
1001270 — REVERSED.
1001300 — REVERSED.
Houston, See, Lyons, Brown, Johnstone, Harwood, and Stuart, JJ., concur.
Moore, C.J., concurs in the result.
[2] The "Foundation Program Fund" was created in Act No. 95-314, 1995 Ala. Acts 634, codified variously, at Ala. Code 1975, §§ 16-13-144(a) and -13-230 to -239.
[3] In her complaint in intervention, Harper described herself as "representing a class of school-aged children in Alabama who are or will be students in Alabama school systems that are unable to provide them with the opportunity for an adequate education." The ADAP alleged that it "protects and advocates on behalf of Alabama citizens with disabilities under the authorization of 42 U.S.C. § 6042," with the consequent "authority and duty to independently pursue the legal rights of children with disabilities who reside in the State of Alabama." Both Harper and the ADAP are parties in the perennial litigation popularly known as the "Equity Funding Case." Ex parte James, 713 So.2d 869, 871 (Ala. 1997);Pinto v. Alabama Coalition for Equity, 662 So.2d 894 (Ala. 1995); Opinionof the Justices No. 333, 624 So.2d 107 (Ala. 1993).
[4] Of course, they also urge us to dissolve the April injunction.
[5] Moreover, it is the position of the plaintiffs and the Executive Parties that Act No. 95-313 and Act No. 95-314 changed fundamentally the manner in which § 40-4-90 is to be implemented. That position, if valid, would raise serious questions of conflict with provisions of the Alabama Constitution, most notably, Ala. Const. 1901, § 45. Section 45 provides in pertinent part: "Each law shall contain but one subject, which shall be clearly expressed in its title. . . ." (Emphasis added.) Yet, there is nothing in the titles of Act No. 95-313 or Act No. 95-314 that suggests the Legislature intended to affect the manner in which program funds are appropriated or disbursed for subsequent allocation. The title of neither act purports to amend § 40-4-90. Indeed, neither title mentions § 40-4-90. Alternatively stated, if the 1995 directive is to be construed as the plaintiffs and the Executive Parties insist, it would seem to comprise a revision of the Budget Act, and, therefore, subject matter separate and distinct from the remaining subject matter of either Act No. 95-313 or Act No. 95-314.
In this connection, we are constrained by the familiar rule that if "there are two possible [statutory] interpretations, by one of which the statute would be unconstitutional and by the other would be valid, the courts should adopt the construction [that] would uphold it." Monroe v.Harco, Inc., 762 So.2d 828, 831 (Ala. 2000). At any rate, because we find no merit in the position of the plaintiffs and the Executive Parties, we do not decide whether the 1995 directive violates provisions of the Alabama Constitution.