PER CURIAM.
This Court “shall never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws'and not of men.” Ala. Const. 1901, § 43 (emphasis added). In Alabama, separation of powers is not merely an implicit “doctrine” but rather an express command; a command stated with a forcefulness rivaled by few, if any, similar provisions in constitutions of other sovereigns. Amendment 582 to the Alabama Constitution of 1901 reflects this State’s adherence to this command by effectively nullifying any “order of a state court, which requires disbursement of state funds, ... until the order has been approved by a simple majority of both houses of the Legislature.” Compelled by the weight of this command and a concern for judicial restraint, we hold (1) that this Court’s review of the merits of the still pending cases commonly and collectively known in this State, and hereinafter referred to, as the “Equity Funding Case,” [1] has reached its end, and (2) that, because the duty to fund Alabama’s public schools is a duty that — for over 125 years[2] — the people of this State have rested squarely upon the shoulders of the Legislature, it is the Legislature, not the courts, from which any further redress should be sought. Accordingly, we hold that the Equity Funding Case is due to be dismissed.
Concerns regarding judicial restraint and the separation of powers have constituted a repeated refrain in this litigation. See James v. Alabama Coalition for Equity, Inc., 713 So.2d 937, 943 (Ala.1997) (discussing the Court’s refusal to review the merits of the Liability Order); Id. at 953 (Maddox, J., concurring in the result but dissenting from the rationale, noting that this case involves “a debate about the doctrine of separation of powers among coordinate, independent branches of state government and about whether certain orders were ‘final’ or not”); Ex parte James, 713 So.2d 869, 878 (Ala.1997) (refusing to consider the merits of the Liability Order, but addressing the political-question doctrine and noting “the American judiciary’s understandable preference for restraint in *816 this complex area of litigation,” 713 So.2d at 881); Id. at 891-94 (Maddox, J., concurring in part and dissenting in part, opining that state officials “should be free to exercise their discretion,” 713 So.2d at 894, with regard to their school-funding duties); Pinto v. Alabama Coalition for Equity, 662 So.2d 894, 900 (Ala.1995) (refusing to allow intervention to “reopen or relitigate the question of the constitutionality of the educational system”); Id. at 901 (Maddox, J., concurring specially, stating that “the question of the power of the circuit court, in the remedy phase, might, and probably will, present questions involving the division of powers between the Executive Branch and the Legislative and Judicial Branches of government”); Id. at 903 (Houston, J., concurring in the result, discussing Ala. Const.1901, § 43, and noting that the legislative and executive branches have the responsibility of “providing for public education”); Opinion of the Justices No. 338, 624 So.2d 107, 110 (Ala.1993) (discussing the “principle of separation of powers” and noting that “[t]he executive and legislative branches of the State have broad powers and responsibilities in the area of public education”).
As the various opinions attached to this and other decisions of this Court stemming from the Equity Funding Case demonstrate, members of this Court have expressed serious concerns regarding the underlying foundations of this case and the trial court’s actions and legal conclusions leading up to and included in its March 31, 1993, “Liability Order.” See, e.g., Ex parte James, 713 So.2d at 895-923 (Hooper, C.J., dissenting, and among other things, describing the proceedings before the trial court as a violation of the separation-of-powers doctrine and as a “sham” due to a lack of true adversity between the parties); Pinto, 662 So.2d at 901-10 (Houston, J., concurring in the result, criticizing the trial court’s “interpretation of the Constitution of Alabama of 1901, §§ 1, 6, and 22, which [the trial court interpreted] to provide equal protection,” 662 So.2d at 904). However, the Liability Order having been purportedly made “final” by the trial court pursuant to Rule 54(b), Ala. R. Civ. P., and never appealed, this Court has, rightly or wrongly, so far refused to review the merits of the Liability Order.
Given our ultimate holding in this opinion, we deem it judicially imprudent now — after issuing four decisions in this case over the past nine years — to test the bounds of judicial restraint in such a manner. Our present concerns parallel the rationale that undergirds the principle of stare decisis:
“The rule of stare decisis is founded on principles of conservatism; not intended to prevent progress in the science of the law, and such modifications and adaptations of judicial decisions as may be required by the varying and advancing conditions of society and industries; but most beneficial, when applied in the exercise of a sound and wise discretion. The rule does not rest on a disaffirmance of judicial fallibility. Its invocation implies, that former decisions may be erroneous, adherence to which, though erroneous, will be productive of much less evil than a departure therefrom .... The quieting of litigation; the public peace and repose; respect for the judicial administration of the law, and confidence in its reasonable certainty, stability, and consistency, and all considerations of public policy call for permanently upholding acts done, contracts executed, rights vested, and titles to property acquired on the faith of decisions of the court of last resort.”
Bibb v. Bibb, 79 Ala. 437, 443-44 (1885). However, our restraint should not be seen as establishing some new formula for de *817 termining when this Court will decline to rule on an issue or to exercise its inherent appellate and supervisory powers; the un-disputedly sui generis nature of this case precludes such an interpretation. See Ex parte James, 713 So.2d at 876 (stating that “this case is sui generis in Alabama jurisprudence”).
Like the issues surrounding the Liability Order, the issue of the proper remedy in this case raises concerns for judicial restraint, albeit of a different type. With regard to the remedy, our concern is not that this Court should refrain from potentially harming the public’s confidence in the “reasonable certainty, stability, and consistency” of decisions of the judicial branch, but rather that the pronouncement of a specific remedy “from the bench” would necessarily represent an exercise of the power of that branch of government charged by the people of the State of Alabama with the sole duty to administer state funds to public schools: the Alabama Legislature. As Justice Houston noted in Ex parte James:
“Circumstances have denied this Court the opportunity to review the trial court’s liability order. Even so, it is the duty of the Judicial Department of Alabama government only to determine what the Constitution of Alabama requires. In my opinion, the Legislative Department and the Executive Department, and not the Judicial Department, have the power and duty to implement a plan that would make this system equitable (and hence, according to the trial court’s liability order, constitutional). I trust that the Legislative Department and the Executive Department will proceed to exercise the power and perform the duty they have been called upon to exercise and perform to make Alabama’s public educational system constitutional. The ‘Separation of Powers’ provision of the Constitution of Alabama of 1901 (Art. Ill, § 43) prohibits me from doing more, without resorting to unconstitutional judicial activism, which I have heretofore avoided.” •
713 So.2d at 895 (emphasis added) (Houston, J., concurring in the result in part and dissenting in part).
Our. consideration of this issue stems from our June 29, 2001, order vacating the remand in Ex parte James;[3] however, our conclusion merely purifies and extends — in the light of § 43 of the Alabama Constitution of 1901 — the analysis previously undertaken in Ex parte James. In Ex parte James, the Court recognized the serious difficulties implicated by judicial involvement in the administrative details of school funding. 713 So.2d at 880-82. In its discussion of whether the judiciary had the authority to provide a specific remedy directing the administration of public-school *818 funds, a plurality[4] of this Court summarized the relevant decisions of other jurisdictions as follows, acknowledging that courts defer to the legislative branch in matters of public education, but apparently finding solace in what those decisions do not say:
“Other courts have deferred to their legislatures, expressing in language similar to that used in Rose [v. Council for Better Education, Inc., 790 S.W.2d 186 (Ky.1989)] confidence that their legislatures would promptly act to remedy constitutional infirmities in their public educational systems. See, e.g., Seattle School Dist. No. 1 v. State, 90 Wash.2d 476, 585 P.2d 71, 104 (1978) (‘We have great faith in the Legislature and its ability to define “basic education” and a basic program of education....’); Serrano v. Priest, 18 Cal.3d 728, 557 P.2d 929, 135 Cal.Rptr. 345 (1976) (We are confident that the Legislature, aided by what we have said today ..., will be able to devise a public school financing system which achieves constitutional conformity ....’), cert. denied, 432 U.S. 907, 97 S.Ct. 2951, 53 L.Ed.2d 1079 (1977). None of the cases we have found in our research, however, has held that the judiciary lacks the power to order a specific remedy if the legislature ultimately fails adequately to address the constitutional deficiency.”
Ex parte James, 713 So.2d at 880 (some emphasis added; some emphasis original).
We find nothing in the plurality’s argument, based on silence, that could justifiably support judicial intrusion into legislative matters. Arguments based on what courts do not say, logically speaking, are generally unreliable and should not be favored by the judiciary; this is especially true when the judiciary is faced with, as we are here, a contrary constitutional mandate such as § 43 of the Alabama Constitution of 1901. Cf. United States v. Butler, 207 F.3d 839, 851 (6th Cir.2000) (noting that an argument based on congressional silence on an issue would not overcome textual evidence of congressional intent) (citing Burns v. United States, 501 U.S. 129, 136, 111 S.Ct. 2182, 115 L.Ed.2d 123 (1991)). Moreover, such judicial intrusion would represent a jurisprudential divergence with other state courts, who, including those mentioned in Ex parte James, have refused to become involved with school-funding matters, acknowledging, as we do today, such matters to be purely legislative in nature. See, e.g., Seymour v. Region One Bd. of Educ., 28 Conn. L. Rptr. 508 (Conn.Super.Ct.2001) (not published in A.2d) (dismissing a challenge to a state law allocating school funds because the case raised what were purely “questions for lawmakers”); Lewis E. v. Spagnolo, 186 Ill.2d 198, 208, 710 N.E.2d *819 798, 804, 238 Ill.Dec. 1, 7 (1999) (“ ‘questions relating to the quality of education are solely for the legislative branch to answer’ ” (quoting Committee for Educ. Rights v. Edgar, 174 Ill.2d 1, 24, 672 N.E.2d 1178, 1189, 220 Ill.Dec. 166, 177 (1996))); Marrero v. Commonwealth, 559 Pa. 14, 20, 739 A.2d 110, 114 (1999) (affirming that such matters are “exclusively within the purview of the General Assembly’s powers, and they are not subject to intervention by the judicial branch of our government”); Abbeville County School Dist. v. State, 335 S.C. 58, 69, 515 S.E.2d 535, 541 (1999) (refusing to “usurp the authority of [the legislative branch] to determine the way in which educational opportunities are delivered to the children of [South Carolina]” or to allow “the courts of this State to become super-legislatures”).
Our conclusion that the time has come to return the Equity Funding Case in toto to its proper forum seems a proper and inevitable end, foreshadowed not only by the obvious impracticalities of judicial oversight,[5] but also by the Court’s own actions in Ex parte James. While the plurality in Ex parte James opined that, in the abstract, the judiciary had the authority to implement a remedy, it did not attempt this task (which may have proven illustrative, because its concrete, rather than abstract, form would have proven its legislative nature) and instead admitted that “the legislature ... bears the ‘primary responsibility’ for devising a constitutionally valid public school system.” Id. at 882 (quoting McDuffy v. Secretary of the Exec. Office of Educ., 415 Mass. 545, 619 n. 92, 615 N.E.2d 516, 554 n. 92 (1993) (quoting Edgewood Indep. School Dist. v. Kirby, 777 S.W.2d 391, 399 (Tex.1989))). Accordingly, the opinion vacated the trial court’s remedy plan and directed the Legislature to formulate a constitutional education system within one year. Id. at 882. Almost a year later, on rehearing, a majority of the Court modified that opinion to allow the Legislature an undefined and open-ended “reasonable time” within which to formulate such an education system, and the case was remanded to the trial court, which would retain jurisdiction. Id. at 935.
Continuing the descent from the abstract to the concrete, we now recognize that any specific remedy that the judiciary could impose would, in order to be effective, necessarily involve a usurpation of that power entrusted exclusively to the Legislature.[6] Accordingly, compelled by the authorities discussed above — primarily by our duty under § 43 of the Alabama Constitution of 1901 — we complete our judicially prudent retreat from this province of the legislative branch in order that we may remain obedient to the command of the people of the State of Alabama that we “never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and hot of men.” Ala. Const.1901, § 43 (emphasis added).
CASES DISMISSED.
*820 SEE, BROWN, HARWOOD, and STUART, JJ., concur.
HOUSTON, J., concurs specially.
WOODALL, J., concurs in the result.
MOORE, C.J., concurs in the result in part and dissents in part.
JOHNSTONE, J., dissents.
LYONS, J., recuses himself.

. On May 3, 1990, the Alabama Coalition for Equity and various other plaintiffs filed a complaint (“the ACE complaint”) in the Montgomery Circuit Court, challenging Alabama's method of funding Alabama public schools as violating the equal protection of the laws as allegedly guaranteed by §§ 1, 6, and 22 of the Alabama Constitution of 1901. Alabama Coalition for Equity, Inc. v. Hunt, CV-90-883. On January 18, 1991, a group of plaintiffs eventually known as the Harper class filed a similar complaint (“the Harper complaint”) challenging the funding as violating a “fundamental right to education" for “all of Alabama’s children between the ages of seven and twenty-one years,” allegedly guaranteed in Art. XIV, § 256 of the Alabama Constitution of 1901, as originally adopted. Harper v. Hunt, CV-91-117. Additionally, on July 24, 1992, the court certified as a subclass a group of plaintiffs (the “Doe subclass”) who intervened to add claims under Ala.Code 1975, §§ 16-39-3 and 16-39A-2. These cases were eventually consolidated into what is now known as the "Equity Funding Case,” a case that is still pending before the Montgomery Circuit Court.

. The Constitutions of 1819, 1861, and 1865 provided that education should simply be "encouraged.” Ala. Const. 1819, Art. VI; Ala. Const. 1861, Art. VI; Ala. Const. 1865, Art. IV, § 33. The Reconstruction Constitution of 1868 went further and created a detailed education system, supervised by a "Board of Education” invested with “full legislative powers” over educational institutions. Ala. Const. 1868, Art. XI, § 5. The “Board of Education” was charged with the duty to establish free public schools in each township or school district, and its "acts” had the force and effect of law, subject to a veto by the Governor. Id. at § 6. The Constitutions of 1875 and 1901, however, placed the power over education in the Legislature (or General Assembly). Ala. Const. 1875, Art. XIII, § 1; Ala. Const 1901, Art. XIV, § 256 (unamended).

. On June 29, 2001, after issues involved in the Equity Funding Case were brought before us as a purported shield to proration in Siegelman v. Alabama Ass'n of School Boards, 819 So.2d 568 (Ala.2001), eight members of this Court (with one Justice recusing) issued the following order vacating our remand of the case in Ex parte James:

“ORDER

"On December 3, 1997, we remanded cases 1950030, 1950031, 1950240, 1950241, 1950408, and 1950409 to the trial court with directions that that court retain jurisdiction. In order that the question of this Court’s subject-matter jurisdiction over those cases may be addressed, that remand order is ex mero motu vacated to the limited extent of requiring the parties to present briefs directed to the issue whether the order in the liability phase entered on March 31, 1993, declaring that Alabama’s public education system violated 'Ala. Const. art. I, §§ 1, 6, 13, and 22 ... and art. XIV, § 256 ...' was a final, appealable order.
"All parties are given 28 days from the date of this order, to file briefs addressing this limited issue.”

. See Ex parte James, 713 So.2d at 899 (Hooper, C.J., dissenting) (“As to the liability order, there exists a majority. As for the remedy order, there appears to be a plurality.”). The main opinion in Ex parte James was written by Justice Cook with Justices Shores, Kennedy, and Ingram concurring. Justice Almon concurred specially, but specifically stated that he "express[ed] no opinion as to the merits of the Remedy Plan or as to the proper scope of any remedy order that may ultimately be entered,” and that "any serious constitutional questions, such as a separation of powers question, could be addressed to the extent that they apply to a remedy order.” 713 So.2d at 887 (Almon, J., concurring specially). Justice Butts recused himself, and Justice Maddox, Justice Houston, and Chief Justice Hooper each wrote specially and opined that it was the sole duty of the legislative branch to remedy any problems regarding the administration of school funding. See 713 So.2d at 889-94 (Maddox, J., concurring in part and dissenting in part), at 894-95 (Houston, J., concurring in the result in part and dissenting in part), and at 895-918 (Hooper, C.J., dissenting).

. See City of Pawtucket v. Sundlun, 662 A.2d 40, 59 (R.I.1995) (noting that, in attempting to define what constitutes a "thorough and efficient” education under the New Jersey Constitution, "the New Jersey Supreme Court has struggled in its self-appointed role as overseer of education for more than twenty-one years, consuming significant funds, fees, time, effort, and court attention. The volume of litigation and the extent of judicial oversight provide a chilling example of the thickets that can entrap a court that takes on the duties of a Legislature.”).

. We note that the Legislature has not been inactive with respect to education while this litigation has been proceeding. See Ala.Code 1975, § 16-6A-2 et seq. (the Educational Reform Act of 1994); Ala.Code 1975, § 16-6B-1 et seq. (the Education Accountability Act of 1995); and Ala.Code 1975, § 16-13-230 et seq. (the Foundation Program Act of 1995).